Argued and submitted May 8, 1996, Sections 3, 4, 11, 14, 15, 16, and 17 of Measure 9 declared void February 6, 1997

Fred VANNATTA,
Jon A. Chandler, Guardian Ad Litem
for David Michael Chandler, a minor,
George Boehnke, Center to Protect Free Speech, Inc.,
an Oregon nonprofit corporation,
Public Affairs, Inc., an Oregon corporation,
and Greater Salem Area PAC, a political committee,
*Petitioners,*

*v.*

Phil KEISLING,
in his capacity as Secretary of State,
*Respondent,*

*and*

LEAGUE OF WOMEN VOTERS
and Oregon State Public Interest Research Group,
*Intervenors.*

(SC S42506)

931 P2d 770

John DiLorenzo, Jr., of Hagen, Dye, Hirschy & DiLorenzo, P.C., Portland, argued the cause for petitioners. With him on the briefs were Michael E. Farnell and Aaron K. Stuckey and John R. Faust, Jr., of Schwabe, Williamson & Wyatt, Portland.

Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause for respondent. With him on the briefs were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Lawrence Wobbrock, Portland, argued the cause for intervenors. Daniel E. O'Leary and Timothy R. Volpert, of Davis Wright Tremaine, Portland, filed the brief.

Annette E. Talbott, Portland, filed a brief for *amicus curiae* Common Cause of Oregon.

Leslie M. Roberts and Andrea R. Meyer, Portland, filed a brief for *amici curiae* The American Civil Liberties Union Foundation of Oregon, Inc. and the American Civil Liberties Union of Oregon, Inc., The Right to Privacy Political Action Committee, The Social Workers Political Action Committee, and the Oregon Faculties Political Action Committee.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Graber, and Durham, Justices.*

GILLETTE, J.

---

* Unis, J., retired June 30, 1996, and did not participate in this decision. Fadeley, J., did not participate in the decision in this case.

## GILLETTE, J.

This case involves challenges, under various provisions of the Oregon Constitution, to portions of Oregon Laws 1995, chapter 1, ("Measure 9") (a set of statutes adopted by the voters through the initiative process).[1] The measure provides for mandatory limits on contributions to state political campaigns, as well as for voluntary expenditure limits by political candidates during their campaigns, and includes various other provisions relating to political contributions and expenditures. For the reasons set forth below, we hold that several of the constitutional challenges that are made against certain portions of Measure 9 are well taken. Accordingly, we hold that sections 3, 4, and 16 of Measure 9 violate Article I, section 8, of the Oregon Constitution, and are void. We further hold that sections 11, 14, 15, and 17 of Measure 9 are "incomplete and incapable of being executed"[2] and therefore void.

## I. BACKGROUND

Petitioners[3] filed this petition pursuant to the original jurisdiction conferred on this court by section 23(1) of Measure 9.[4] They seek a declaration that Measure 9 is unconstitutional in its entirety. In the alternative, petitioners seek a declaration that sections 3, 4, 6, 8, 10, 11, 13, 14, 15, 16, 17, 19, and 20 violate various state constitutional protections and that, if the foregoing sections are held to be unconstitutional, sections 5, 7, 9, and 12 are void for lack of a purpose. Respondent is the Secretary of State of the State of Oregon. The League of Woman Voters (the League) and the Oregon

---

[1] The full text of Measure 9 is too extensive to be repeated here. It is printed at Oregon Laws 1995, chapter 1.

[2] This standard is set out at section 23(2) of Measure 9, and is discussed more fully below, 324 Or at 545.

[3] Petitioners variously are residents of the State of Oregon, a political action committee, a nonprofit corporation, and a for-profit corporation. Petitioner-residents include a registered lobbyist, a potential candidate for state office, and the guardian *ad litem* of a minor.

[4] Section 23(1) provides:

"Upon petition of any person, original jurisdiction is vested in the Supreme Court of this state to review and determine the constitutionality of this Act. The Supreme Court shall have sole and exclusive jurisdiction of proceedings initiated under this section."

State Public Interest Research Group (OSPIRG) have been permitted to intervene in the proceeding. The American Civil Liberties Union (ACLU) and Common Cause of Oregon have filed *amicus curiae* briefs in the case.

■ As a preliminary matter, the League and OSPIRG ask this court to remand this case to a circuit court for the purpose of developing a factual record through discovery or, in the alternative, to appoint a special master for that purpose. Both petitioners and respondent object, asserting that the issues before this court involve facial challenges to the constitutionality of Measure 9 and, thus, can be decided by this court without taking evidence. We agree with the latter view. Recourse to factfinding is unnecessary. We limit our exercise of the special and original jurisdiction conferred on this court by section 23(1) of Measure 9 to facial challenges asserted by the parties. We deny intervenors' motion to remand or to appoint a special master.[5]

As we turn to the merits, we believe that it is appropriate to insert a general admonition concerning the scope of this opinion. This is a case involving challenges to the constitutionality of a statutory enactment. Those challenges are aimed at the specific wording of various provisions of the enactment. The challenges assert that the wording in question violates one or another principle found in the Oregon Constitution. So understood, the challenges are quite limited.

## II. THE MERITS

A. *Article I, section 8*

Petitioners (and *amicus* ACLU) assert that various sections of Measure 9 violate Article I, section 8, of the Oregon Constitution,[6] in that those sections limit or ban certain political campaign contributions and coerce political candidates to agree to limit their campaign expenditures. Petitioners rely on *Deras v. Myers*, 272 Or 47, 535 P2d 541 (1975),

---

[5] Intervenors also argue derivatively that Article I, section 17, of the Oregon Constitution, ensures the right to a jury trial in civil cases, and that the measure's grant of original jurisdiction to this court violates that constitutional provision. That argument fails because the inquiry in the present case is not one of the kinds of inquiry as to which a jury trial was available in 1859. *See Molodyh v. Truck Insurance Exchange*, 304 Or 290, 295, 744 P2d 992 (1987) (stating rule).

[6] Article I, section 8, of the Oregon Constitution, provides:

as support for their position. In addition, they argue that this court's more recent Article I, section 8, jurisprudence requires the same outcome. The Secretary of State argues that *Deras* is distinguishable and not controlling. He also argues that sections 8 and 26 of Article II, of the Oregon Constitution, have removed campaign contributions and expenditures from the scope of the protection provided by Article I, section 8. Because it is asserted by petitioners to be the cure for all of Measure 9's alleged ills, we address *Deras* first.

### 1. *Deras v. Myers*

In *Deras*, this court considered the constitutionality of two statutes that regulated and restricted campaign expenditures.[7] The then-Secretary of State, Myers, conceded that campaign expenditures are a form of expression and that the statutes restricted this expression. This court implicitly agreed. Starting from that premise, *viz.*, that the statutes restricted protected expression, this court then conducted a balancing analysis to determine whether the Secretary of State's asserted justifications for regulating that expression were sufficient to offset constitutional protections of free expression.[8] 272 Or at 54-65. The court concluded that those asserted justifications—the allegedly destructive effects that uncontrolled expenditures of funds in political campaigns had on the legitimacy of the political process—were not sufficiently clear to justify the substantial restrictions that the challenged statutes placed on free expression. 272 Or at 65.

---

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

[7] One statute, *former* ORS 260.027, *repealed by* Or Laws 1975, ch 684, § 11, limited the amount of permissible campaign expenditures by political treasurers running political campaigns. The other, *former* ORS 260.154, *repealed by* Or Laws 1975, ch 684, § 11, prohibited any expenditures by either persons or political committees, on behalf of a candidate, without prior approval of the candidate. If approved, such expenditures were deemed to have been made by the candidate.

[8] Foreshadowing this court's eventual rejection of a balancing approach to Article I, section 8, in its later jurisprudence, the *Deras* court applied a "balancing" test in that case, but indicated that such a test might not protect freedom of expression adequately under Article I, section 8. 272 Or at 65. The court utilized a balancing approach because it determined that the restrictions on expression that were before it were unconstitutional, even under that less protective standard.

*Deras* provides little assistance in conducting an Article I, section 8, inquiry under this court's present jurisprudence. In *Deras*, this court assumed that campaign expenditures were protected expression and that the challenged statutes restricted that expression. Furthermore, *Deras* did not involve statutes that directly restricted campaign *contributions*. In this case, the parties again concede that campaign expenditures are protected expression, but the Secretary of State disputes both whether campaign contributions are protected expression and whether Measure 9 restricts campaign expenditures in any way that implicates constitutional protections. Therefore, we first need to analyze whether campaign contributions are, in fact, protected expression under Article I, section 8. If they are protected expression, we then must determine whether Measure 9 restricts them or campaign expenditures. To the extent (if any) that Measure 9 restricts protected expression, we then must determine whether such restrictions are permissible under Article I, section 8. We turn to that analysis.

2. *Are political contributions and expenditures protected forms of expression under Article I, section 8?*

■ Both the Secretary of State and Common Cause concede that campaign *expenditures* constitute expression for Article I, section 8, purposes. We accept and agree with that proposition as a general matter. Expenditures by a candidate, an organization, a committee, or an individual, when designed to communicate to others the spender's preferred political choice, is expression in essentially the same way that a candidate's personal appeal for votes is expression. However, both the Secretary of State and Common Cause contend that campaign *contributions* are distinguishable from expenditures and do not constitute expression under Article I, section 8.

The Secretary of State acknowledges that, under the First Amendment, campaign contributions also are recognized as expression. *See Buckley v. Valeo*, 424 US 1, 96 S Ct 612, 46 L Ed 2d 659 (1976) (so holding under federal constitution). Nonetheless, he argues that the rationale supporting that conclusion is unpersuasive and should not be used by

this court in its Article I, section 8, jurisprudence. In the Secretary of State's view, campaign contributions merely are gifts which in themselves are devoid of political expression and, as such, constitute conduct that permissibly may be regulated. As shall be explained, we agree that the approach taken by the United States Supreme Court in *Buckley* does not translate well into our Article I, section 8, jurisprudence. However, our agreement in that regard does not lead us in the direction espoused by the Secretary of State.

Although *Buckley* determined that both expenditures and contributions were forms of expression under the First Amendment, it also concluded that contributions were less central to the core of First Amendment expression and, therefore, could be subject to governmental restriction through a balancing of interests. 424 US at 28-29.[9] Under Oregon's Article I, section 8, jurisprudence, however, there is no basis for distinguishing between closely related forms of expression in the way that the United States Supreme Court does, solely on the basis of the extent to which a particular form of speech is thought by a court to be more or less "central" to the purposes of Article I, section 8.

Even if such distinctions based on the "centrality" of particular forms of expression could be made under Article I, section 8, we would not be persuaded that the reasoning in *Buckley* applied equally well to the protections provided by Article I, section 8. Two of the bases asserted in *Buckley* for finding that contributions are a less protected form of expression than are expenditures were the following assumptions about contributions: (i) although contributions may result in speech, that speech is by the candidate and not by the contributor; and (ii) contributions express only general support for a candidate and do not communicate the reasons for that support. 424 US at 21.

---

[9] *Buckley* concluded that statutes restricting campaign contributions to as little as $1,000 per contributor did not violate the First Amendment. However, two recent federal circuit court cases have ruled that statutes limiting campaign contributions to as low as $100 did violate the First Amendment. *See Day v. Holahan*, 34 F3d 1356 (8th Cir 1994), *cert den* _____ US _____, 115 S Ct 936, 130 L Ed 2d 881 (1995); *Carver v. Nixon*, 72 F3d 633 (8th Cir 1995), *cert den* _____ US _____, 116 S Ct 2579, 135 L Ed 2d 1094 (1996) (both so holding).

Neither of those assumptions appears correct to us. In our view, a contribution is protected *as an expression by the contributor*, not because the contribution eventually may be used by a candidate to express a particular message. The money may never be used to promote a form of expression by the candidate; instead, it may (for example) be used to pay campaign staff or to meet other needs not tied to a particular message. However, the contribution, in and of itself, is *the contributor's expression of support for the candidate or cause*—an act of expression that is completed by the act of giving and that depends in no way on the ultimate use to which the contribution is put. Neither do we perceive any useful constitutional purpose to be served by purporting to gauge whether contributions constitute "general," rather than "specific" or "particularized," support for a candidate or measure.

▮▮▮ Under Oregon law, the sole remaining question is whether contributions to political campaigns and candidates also are a form of expression under Article I, section 8. For the reasons that follow, we conclude that many—probably most—are.[10]

In formulating our answer to the foregoing question, we have constantly kept before us the principle that elections ultimately are for the people, not the candidates. That is, elections are designed to permit the people freely to select those who temporarily will hold public office, as well as to permit the people to take the legislative power into their own hands to make policy decisions. Candidates and measures exist to seek the approval or permission of the voters, not the other way around. Indeed, because Oregon citizens have the constitutional right to assemble in a peaceable manner and

---

[10] We qualify our statement with the limiting word, "many," because there doubtless are ways of supplying things of value to political campaigns or candidates that would have no expressive content or that would be in a form or from a source that the legislature otherwise would be entitled to regulate or prevent. To give but a few examples: A bribe may be an expression of support (with an anticipated *quid pro quo*), but it is not protected expression; a gift of money to a candidate from a corporation or union treasury may be expression but, if it is made in violation of neutral laws regulating the fiscal operation of corporations or unions, it is not protected; a donation of something of value to a friend who later, and unexpectedly, uses that thing of value to support the friend's political campaign is not expression.

instruct their representatives (Article I, section 26), to "free and equal" elections (Article II, section 1), and to use the initiative and referendum (Article IV, section 1(2)), their rights to political expression would be secure, even if there were no Article I, section 8.

We further note that, where Article I, section 8, is concerned, it is a prohibition against "law[s] be[ing] passed" that have the effect of "restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever." If it can be shown that financial contributions and expenditures are "the free expression of opinion," laws limiting such activities run afoul of the constitutional protection. But lawmakers might choose to impose requirements distinct from contribution or expenditure limitations (*e.g.*, requirements of disclosure of financing sources and the extent of any gift) as well as various sanctions (*e.g.*, civil or criminal penalties, disqualification from the ballot or Voters' Pamphlet, and the like) and their choice may not *necessarily* offend the constitutional requirement. This case involves a mixture of laws, some aimed at contributions and expenditures themselves and some aimed at ancillary questions such as disclosing whether a candidate voluntarily has agreed to limit his or her expenditures. As we shall see, those differences make a difference.

We think that it takes little imagination to see how many political contributions constitute expression. We assume, for example, that no one would deny the right of a citizen to purchase individually a newspaper ad that urges others to support a particular candidate or cause. And, if the individual can persuade enough neighbors and friends to join in the effort, the resulting spending power may produce much larger ads or television or radio commercials. No one, we take it, would gainsay the right of the individual to amplify his or her voice through collective buying power— gaining adherents for one's views is the essential purpose of political advocacy. It then follows ineluctably that the contribution of the collective "pot" thus collected is expression, just as the individual's ad was. Indeed, it does not even matter if the money goes directly into an ad created by the contributors themselves or, instead, the money goes to professionals

who create the ad for a fee. The outcome is the same—"expression," for the purposes of Article I, section 8.

Viewed in the foregoing way, expenditures and contributions can be better seen for what they are—not opposite poles, but closely related activities. But the right to spend money to encourage some candidate or cause does not necessarily extend to spending other people's money on a political message without their consent, whether that money comes from compulsory union fair share fees, a shareholder's equity, student activity fees, or dues paid to an integrated Bar. Similarly, the law may prohibit certain forms of contributions such as giving bribes.

■ The foregoing notwithstanding, Common Cause argues that expressions of generalized support for a candidate are not tied to any *particular* message and, thus, should not be recognized as expression under Article I, section 8. We disagree. Article I, section 8, does not make such fine distinctions. Expressions do not fall within or without the scope of Article I, section 8, based on the particularity or the intensity of their message.

In any event, the distinction that Common Cause attempts to make is illusory. An expression of generalized support *is* a particular message. If, instead of giving a contribution, a citizen stood on a street corner and announced, "I support candidate X," there would be no doubt that that message constituted an expression of general support for that candidate, as well as a more particular message: "X deserves your vote." From the perspective of the contributor, the contribution is the same kind of message as is the street corner announcement.

From the foregoing discussion, we conclude that both campaign contributions and expenditures are forms of expression for the purposes of Article I, section 8.[11]

---

[11] Although not analyzing the point in any detail, this court recognized as much in *In re Fadeley*, 310 Or 548, 564, 802 P2d 31 (1990), when the court stated: "The lawyer has an absolute constitutional right to support whom he or she pleases, both with money and with a vote." Although speaking in terms of lawyers, the court was asserting the rights of citizens, generally. We also note that we are unaware of any state court that has found campaign contributions *not* to be expression for purposes of its free-speech analysis.

The Secretary of State nevertheless argues that expression otherwise protected under Article I, section 8, is not protected in the context of political campaigns, due to what he views to be the countervailing effect of Article II, sections 8 and 22, of the Oregon Constitution. Previously, this court has not addressed the relationship between those sections and Article I, section 8. We turn to that issue.

### a. Article II, section 22

Article II, section 22, was passed by initiative as Measure 6 at the same election at which Measure 9 was adopted. It provides in part:

> "For purposes of campaigning for an elected public office, a candidate may use or direct only contributions which originate from individuals who at the time of their donation were residents of the electoral district of the public office sought by the candidate * * *."

The Secretary of State argues that that constitutional amendment more specifically addresses the right of expression bestowed on individuals who seek to contribute to Oregon political campaigns than does Article I, section 8. Consequently, the Secretary of State asserts that Article II, section 22, "is preemptive" and that " 'it occupies the field' and defines campaign contribution rights under the Oregon Constitution."

Petitioners respond by pointing out that Article II, section 22, has been declared void by a federal district court. *See Vannatta v. Keisling*, 899 F Supp 488 (D Or 1995) (so holding, declaring that Article II, section 22, violates the First Amendment; accompanying injunction bars Oregon's Secretary of State and Attorney General from "enforcing or attempting to enforce" Article II, section 22).[12] Petitioners argue that the effect of that federal court decision is that Article II, section 22, no longer has any legal existence and, therefore, cannot be relied on to define the scope of Article I, section 8. Petitioners' argument raises an interesting question of federalism, *viz.*, whether a federal district court's declaration

---

[12] Issues concerning the constitutionality of Measure 9 under the First Amendment also were raised in that case. The federal court abstained from deciding those issues until after this court first considered them.

that a state's constitutional provision violates the United States Constitution and, therefore, is void prevents the state's courts from relying on that provision later to decide a state constitutional matter. However, given the present posture of the federal district court decision, we do not find it necessary to resolve that issue in this case.

Of course, federal district courts are empowered to decide whether a state law violates the United States Constitution. The decision of the federal district court in *Vannatta* is illustrative of that process. However, that decision currently is on appeal to the United States Court of Appeals for the Ninth Circuit. Therefore, no final judgment has been rendered in that case. The question of the constitutionality of Article II, section 22, under the First Amendment, remains unresolved. Therefore, we consider the merits of the Secretary of State's argument.

By its terms, Article II, section 22, prohibits candidates from using campaign contributions from individuals who reside outside the candidate's voting district. The Secretary of State argues that, by using the term "individuals," the provision prohibits not only the use of contributions from citizens outside a voting district, but also the use of contributions from all corporations, businesses, labor unions, and political action committees (PACs), whether or not those entities reside inside a voting district.

On its face, it is unclear whether the provision prohibits the use of contributions from corporations, businesses, labor unions, and PACs and, if so, whether it restricts use of contributions only from those entities residing outside a candidate's voting district or, instead, flatly prohibits use of contributions from all such entities. We need not resolve those questions for the purposes of this case. *Assuming* that Article II, section 22, prohibits the use of political contributions from anyone except individual citizens residing inside a candidate's voting district, the Secretary of State's argument that the provision preempts *any* protections afforded by Article I, section 8, in this context still is overinclusive, and fails.

The Secretary of State argues that "[t]he general guarantees of the free speech clause cannot be said to confer

rights that the specific provisions of Article II, section 22 restrict." Even assuming that premise is correct, the reach of the Secretary of State's theory exceeds its grasp. Article II, section 22, does not restrict candidates from using campaign contributions of individuals who reside *inside* the candidate's voting district *in any way*. Therefore, Article II, section 22, cannot be said to negate whatever protections are afforded to individual citizens who reside inside the relevant district under Article I, section 8.

■ The Secretary of State appears to argue nonetheless that, although Article II, section 22, does not address expressly all forms of political contributions restricted by Measure 9, it still preempts the entire field of campaign contributions. We disagree. Article I, section 8, has protected expression in the most sweeping terms since its enactment in 1859. *See, e.g., State v. Stoneman*, 323 Or 536, 541, 920 P2d 535 (1996) (stating that the sweep of Article I, section 8, is broad and that it "extends not only to written and spoken communications, but also to verbal and nonverbal expressions"). Any particular forms of expression that have been removed from that protection by a subsequent constitutional amendment must be construed carefully to give effect to the scope of the later exception, but no more, lest the salutary value of Article I, section 8, unintentionally be lost. Even construing Article II, section 22, to the broadest extent that its wording will bear, we conclude that it does not eliminate whatever protection Article I, section 8, otherwise may afford to campaign contributions that are made by individuals residing inside the voting district in question.[13] Because Measure 9 limits, *inter alia*, contributions made by individuals residing inside the districts to the candidates who are running in those districts, those restrictions, if they fall within the scope of Article I, section 8, cannot be saved by Article II, section 22. We turn to the other section of Article II on which the Secretary of State relies.

---

[13] No party has separately argued for any *partial* application of Article II, section 22, to corporations, unions, or PACs. Article II, section 22, has been presented to us only in the form of an "all or nothing" preemption. As we have explained, that argument is not well taken.

### b. Article II, section 8

The Secretary of State also argues that Article II, section 8, removes the contribution and expenditure restrictions imposed by Measure 9 from any protection under Article I, section 8. Article II, section 8, provides:

"The Legislative Assembly shall enact laws to support the privilege of free suffrage, prescribing the manner of regulating, and conducting elections, and prohibiting under adequate penalties, all undue influence therein, from power, bribery, tumult, and other improper conduct."

The Secretary of State construes the foregoing wording to allow the legislature, or the people acting through the initiative process, to enact laws that restrict campaign contributions and expenditures. Petitioners respond that the provision empowers only the legislature, not the people, to enact laws and that, in any case, it applies only to elections, not to campaigns. We address each of those theories in turn.

■ Petitioners' argument that the constitution empowers only the Legislative Assembly, and not the people, to enact laws relating to elections is not well taken. The reference in Article II, section 8, to the "Legislative Assembly" must be read *in pari materia* with the later-adopted constitutional provision that created Oregon's initiative and referendum process. Article IV, section 1, of the Oregon Constitution, now provides: "The legislative power of the state, *except for the initiative and referendum powers reserved to the people*, is vested in a Legislative Assembly, consisting of a Senate and a House of Representatives." (Emphasis added.) The emphasized portion of Article IV, section 1, was added to that section by a vote of the people on June 2, 1902.[14] Since its adoption, the people have shared with the Legislative Assembly the power to enact laws. Petitioners' first argument fails.

We turn to petitioners' second argument, *viz.*, that Article II, section 8, is addressed to "elections," not to "political campaigns," and that the two concepts are different. For

---

[14] The quoted text is part of the present wording of Article IV, section 1, and was not part of the original provision. However, similar wording to the same effect was present in the original provision.

the reasons that follow, we agree with the thrust of this argument.

■ To interpret a provision of the Oregon Constitution, this court considers "[i]ts specific wording, the case law surrounding it, and the historical circumstances that led to its creation." *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). We begin our inquiry with a review of the wording of Article II, section 8.

Unlike the recently created Article II, section 22, Article II, section 8, has been in the Oregon Constitution since statehood. It is directed to the legislature and requires that body to "enact laws" that will "support the privilege of free suffrage" in two ways: (i) by "prescribing the manner of regulating, and conducting elections"; and (ii) by "prohibiting * * * all undue influence therein." The first clause may be broken down further into two parts: The legislature is to (1) prescribe the manner of regulating elections; and (2) prescribe the manner of conducting elections. That is, both parts refer to "elections." As a matter of grammar, the word "therein" in the second clause also refers to the topic mentioned earlier, *viz.*, "elections." Thus, the second clause properly may be restated as referring to "all undue influence [in elections]." There is no specific mention in Article II, section 8, of the word "campaigns." Yet, at the time that Article II, section 8, was adopted in Oregon in 1859, the behavior that we now think of as political campaigns was commonplace.[15]

The Secretary of State would have us construe "elections" to include *all* activities that occur during political *campaigns*. But the two concepts do not necessarily overlap so completely. A present day dictionary defines "election" as "the act or process of choosing a person for office, position, or membership by voting." *Webster's Third New Int'l Dictionary* at 731 (unabridged 1993). "Campaign" is defined as "a series of operations or efforts designed to influence the public to support a particular political candidate, ticket, or measure."

---

[15] For instance, at the level of presidential elections, widespread campaigning dates back at least as far as 1824 and the Andrew Jackson era. Roger A. Fischer, *Tippecanoe and Trinkets Too* vii-viii (1988).

*Id.* at 322. The parties have gone to considerable effort to persuade us either that the two concepts are the same or that they are completely distinct.

If one were to utilize the modern definition of "election" as a "process," there would be room for the Secretary of State's argument for a sweeping interpretation of the word "elections" in Article II, section 8, because the "process" contemplated by the section could be deemed to be the entire electoral adventure, from the announcement of candidacy through the canvassing of election returns. However, the constitutional provision that we construe here was proposed in 1857, not in 1996. A dictionary relevant to that time gives a more limited definition of the word "election": "The act of choosing a person to fill an office or employment, by any manifestation of preference, as by ballot, uplifted hands or viva voce[.]" *Webster's American Dictionary of the English Language* (1828).

The dictionary on which we rely has no definition of "campaign" that corresponds to the present-day use of that word as a description of the effort to obtain public office or to obtain the passage of an initiated or referred measure. The concept of that time closest to what we now term "campaigning" was "electioneering," which Noah Webster defined as "[t]he arts or practices used for securing the choice of one to office." *Webster's American Dictionary of the English Language* (1828). It thus appears that, whatever the degree of their overlap today, the ideas of "electioneering" and "elections" were somewhat distinct at the pertinent time, *viz.*, at the time that the Oregon Constitution was created.

Our precedents make it clear that, when construing provisions of our constitution, we attempt to understand the wording in the light of the way that wording would have been understood and used by those who created the provision. *See, e.g., State v. Kessler,* 289 Or 359, 368-69, 614 P2d 94 (1980) (explicating that the term "arms" in the phrase, "[t]he people shall have the right to bear arms for the defence (*sic*) of themselves" in Article I, section 27, of the Oregon Constitution, must be construed in the light of the kind of weapons carried for personal protection at the time of the creation of the Oregon Constitution). So it is in the present case. To those

who created the Oregon Constitution, "elections" were a relatively narrowly defined concept.

It thus appears to us that, in order to keep faith with the ideas imbedded in Article II, section 8, we should construe "elections" to refer to those events immediately associated with the act of selecting a particular candidate or deciding whether to adopt or reject an initiated or referred measure. We do not suggest, by our use of the phrase "immediately associated with," that the legislature's power is limited in time—a bribe to vote a particular way that was given months before an election still would appear to fall within the ambit of Article II, section 8. But we do suggest that, given the relevant historical meaning of the word used, the legislature's mandate is a confined one.

This brings us back to our discussion of the wording that actually appears in the constitutional provision. The focus of section 8 is on "free suffrage"—a holdover from the fascination with the idea of an expanding electorate that dominated political discussion in the first half of the nineteenth century. As we have explained, section 8 specifically authorizes laws that support free suffrage in three ways: (1) by prescribing the manner in which elections will be regulated; (2) by prescribing the manner in which elections will be conducted; and (3) by prohibiting "all undue influence therein." As we read them, each of those three different ways of supporting free suffrage has a different scope, and the differences matter.

The direction to enact laws prescribing the manner in which elections will be *regulated* appears to speak to laws that establish what offices will be elective, who will be eligible to run for and serve in them, when and how such persons must make their candidacy official, who will be eligible to vote in elections for those offices, and the like. In addition, the term "regulating" appears to encompass the question of who generally will be eligible to vote, what the qualifications for that privilege will be, how one establishes eligibility, and the like. Finally, the term appears to authorize the legislature to designate public officials to oversee the elections process.

The direction to enact laws prescribing the manner of *conducting* elections, by contrast, appears to be concerned with the mechanics of the elections themselves, *i.e.*, with questions of where and how many polling places there will be, how they shall be operated, who may be present in them to ensure their proper operation, and the like.

The foregoing explication fits readily with the examination of the final provision of Article II, section 8, which calls for laws that "prohibit * * * all undue influence therein, from power, bribery, tumult, and other improper conduct." As we already have explained, "therein" refers to "elections." Thus, the legislature is directed to enact laws prohibiting all "undue influence" in elections from the sources identified in the constitutional text.

Given our reading of the term "elections," together with the scope of the concepts of "regulating" and "conducting" in Article II, section 8, the only way in which the Secretary of State's argument may prevail is if the concepts of "undue influence" and "other improper conduct," as used in Article II, section 8, are more expansive than the other two concepts. We think, however, that, when the phrase, "undue influence * * * from * * * other improper conduct," is read in the context of the other words and phrases of which it is a part, it will not support that reading.

The clause directing the legislature to prohibit all undue influence in elections specifically enumerates the sources of influence that it considers to be "undue": "power, bribery, tumult, and other improper conduct." As we understand them, each of the first three enumerated examples is concerned specifically with the act of voting itself. "Power" appears to be a reference to the possibility that persons might, by a show of force, either attempt to prevent an election from occurring or coerce a particular outcome. *See Webster's American Dictionary of the English Language* (1828) (defining "power" as, *inter alia*, "[v]iolence; force; compulsion"). "Bribery" appears to be a reference to someone actually paying a voter to vote in a particular way. And "tumult" again is a reference to the kind of unruly or riotous conduct at or near the polling place that would have the actual effect of hindering or preventing the voting process. Thus, all three

specific examples in the clause speak to actual interference in the act of voting itself. None is as broad in scope as either the concepts of "regulating" or "conducting," and both of those concepts in turn speak to a narrow historical concept of "elections."

■ Given the scope of the three specific examples in the clause, it becomes clear why the Secretary of State's expansive reading of the last, unspecific phrase, "other improper conduct," probably is not the appropriate one. Under the doctrine of *ejusdem generis*, a nonspecific or general phrase that appears at the end of a list of items in a statute is to be read as referring only to other items of the same kind. *See, e.g., State v. K. P.*, 324 Or 1, 11 n 6, 921 P2d 380 (1996) (illustrating doctrine). Therefore, because the first three listed items in the clause all appear to refer to conduct that interferes with the the act of voting itself, rather than with the far broader concept of political campaigning, the last phrase also should be read as being confined to that more narrow scope. Ordinary campaign contributions and expenditures do not constitute "undue influence" under any one of the specified sources of undue influence. The Secretary of State's contrary argument is not well taken.

In summary, we are of the view that, based solely on the wording of the constitutional provision itself, the reading that the Secretary of State wishes to give to it appears to be incorrect. However, we have, pursuant to the process described in *Priest*, examined the historical circumstances that led to the creation of the constitutional provision, in order to determine whether there is something in the background of the provision that calls for a revision of our preliminary reading of it.

The historical context in which Article II, section 8, was adopted is interesting, but does not alter our tentative view arrived at on the basis of text alone. That provision derives from a similar provision in the Connecticut Constitution of 1818.[16] *See* W.C. Palmer, *The Sources of the Oregon*

---

[16] Article 6, section 6, of Connecticut's 1818 Constitution provided:

"Laws shall be made to support the privilege of free suffrage, prescribing the manner of regulating and conducting meetings of the electors, and prohibiting, under adequate penalties, all undue influence therein, from power, bribery, tumult, and other improper conduct."

*Constitution*, 5 Or L Rev 200, 203 (1926) (so asserting); Charles Henry Carey, *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857*, 470 (1926) (relying on Palmer).[17] The Connecticut provision empowered its legislature to enact laws "prescribing the manner of regulating and conducting *meetings of the electors*." (Emphasis added.) That provision expressly limited its scope to such meetings.

The fact that Oregon's provision does not limit its scope expressly to the meeting of electors but, instead, uses the term, "elections," arguably supports either of two different conclusions. On the one hand, it could indicate that the Oregon provision was intended to extend further than the Connecticut provision. On the other hand, the framers of the Oregon Constitution may have regarded the terms, "meetings of the electors" and "elections," as synonymous. But, because we already have assumed a broader reading in our initial discussion of the text, the answer to this issue is irrelevant. None of the clauses of the provision may be read so broadly as to sweep within their scope the acts of contributing to or making expenditures in political campaigns. We have found nothing in the available history of the 1818 Connecticut Constitution that explains what its framers may have had in mind by the use of the term "undue influence," followed by the list of examples that Oregon later adopted. It follows that nothing in our review of the history of Article II, section 8, alters our preliminary reading of that provision.

The context of the other sections in Article II of the Oregon Constitution also supports our conclusion. At statehood, the other sections in Article II dealt almost exclusively

---

The identical provision appears as Article 6, section 4, of the present Connecticut Constitution.

[17] The majority of Oregon's original constitution derives from the Indiana Constitution. *See* Palmer (tabulating the number of provisions to have derived from other state constitutions). Article II, section 8, is the only provision in Oregon's original constitution that is derived from the Connecticut Constitution.

with the rights and qualifications for electors,[18] the qualifications for elected officers,[19] or the time, place, and manner of holding elections.[20] None of those sections spoke to questions of campaigns beyond disqualifying certain *persons* from eligibility to hold office. None spoke to issues of campaign finances at all. When read in context, it is clear that section 8 was not in its focus or scope a radical departure from the sections that surrounded it. Instead, it was—and is—a constitutional directive that laws be enacted to facilitate the other themes established by Article II.

Finally, previous case law does not alter our preliminary conclusion. This court never has attempted to construe the scope and meaning of Article II, section 8, with any precision.[21] Neither are we aware of any Connecticut Supreme Court cases that interpreted that state's analogous provision prior to the adoption of the Oregon provision. *See Priest*, 314 Or at 418 (explaining relevance of another state's Supreme

---

[18] For instance, Article II, section 2, set out age, residence, and registration qualifications for those privileged to vote; section 3 removed the voting privilege from those convicted of certain crimes; sections 4 and 5 prevented seamen, marines, and United States officials from gaining or losing the privilege to vote based on postings in or out of Oregon; and section 13 protected electors from arrest while going to, coming from, or at the polling place or from being required to perform militia duties on the day of an election.

[19] For instance, section 7 prohibited persons from holding public office who had offered bribes or threats to procure election—activities analogous to the references to "power [or] bribery" in section 8; section 9 prohibited persons who had fought in a duel from being elected; section 10 prohibited persons who held lucrative office through the federal or state government from being elected to the state legislature; and section 11 prohibited persons from assuming positions of control over public monies until that person had accounted for any existing financial debt.

[20] For instance, section 1 required that all elections be free and equal; section 14 regulated the time for holding elections; section 15 provided that voting should be "viva voce, until the Legislative Assembly shall otherwise direct"; and section 17 designated the place for holding elections.

[21] This court has alluded to the substantive scope of Article II, section 8, in only three cases. *See In re Fadeley*, 310 Or 548, 558, 802 P2d 31 (1990) (concluding that Article II, section 8, did not prevent the judicial branch from regulating elections of judges); *Libertarian Party of Oregon v. Roberts*, 305 Or 238, 247, 750 P2d 1147 (1988) (briefly referring to Article II, section 8, in comparing several constitutional provisions); *City of Eugene v. Roberts*, 305 Or 641, 649 n 7, 756 P2d 630 (1988) (mentioning in a footnote that Article II, section 8, "entrusts responsibility for prescribing the manner of regulating and conducting elections to the Legislative Assembly"). *See also White v. Commissioners*, 13 Or 317, 327, 10 P 484 (1886) (Thayer, J., dissenting) (discussing the power of the legislature to enact laws in support of free suffrage).

Court case law that predated the adoption of the Oregon Constitution).

■ Having considered the text and context of Article II, section 8, the historical circumstances surrounding its adoption, and this court's case law that has interpreted it, we conclude that Article II, section 8, does not empower the legislature to regulate every kind of alleged "undue" influence arising out of political contributions and expenditures during political campaigns. That provision does not remove the contribution and expenditure restrictions in Measure 9 from whatever protections are afforded to such activities by Article I, section 8. We turn now to that provision.

### 3. *Article I, section 8, analysis*

■ In considering a challenge under Article I, section 8, we first determine whether the challenged provision is "on its face 'written in terms directed to the substance of any "opinion" or any "subject" of communication.' " *State v. Stoneman*, 323 Or 536, 543, 920 P2d 535 (1996) (quoting *State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982)). This is the so-called "first level" of inquiry. If so written, the statute is invalid, unless it fits within a historical exception or can be justified under the "incompatibility" exception to Article I, section 8. *Stoneman*, 323 Or at 543-44.

■ If the statute is not written in terms that are directed to the substance of an opinion or subject of communication, but instead is written in terms that are directed at a harm that may be proscribed, then a second level of inquiry follows. *Id.* at 543. Even when the statute does not, by its terms, target a harm, a court may infer the harm from context. *Id.* at 546; *Moser v. Frohnmayer*, 315 Or 372, 379, 845 P2d 1284 (1993). If the statute targets that harm, then the statute may survive Article I, section 8, scrutiny, even though the statute expressly prohibits expression used to achieve that harm, provided that the statute survives an overbreadth analysis. *Stoneman*, 323 Or at 543; *State v. Plowman*, 314 Or 157, 164, 838 P2d 558 (1992).

Finally, if the statute does not prohibit expression, then the statute is subject only to a vagueness challenge. *Stoneman*, 323 Or at 543. With the foregoing construct in

mind, we turn to the specific provisions of Measure 9 that are at issue in this case.

### a. Contribution Provisions

Sections 3(1)(a) and (b) of Measure 9 provide that "a person or political committee *shall not contribute an aggregate amount exceeding* [$500 to a candidate or the principal campaign committee of a candidate running for statewide office, and $100 to a candidate or the principal campaign committee of a candidate running for State Senator or Representative]."[22] (Emphasis added.)

Section 4 provides—with certain exceptions—that "[a] candidate or the principal campaign committee of a candidate * * * *shall not make a contribution* to [other candidates, principal campaign committees or other political committees]." (Emphasis added.)

Section 16 provides—with certain exceptions—that "[a] corporation, professional corporation, nonprofit corporation or labor organization *shall not make a contribution* * * * to any candidate or political committee." (Emphasis added.) Section 16 provides that "[a] candidate or the principal campaign committee of a candidate *shall not accept a contribution* prohibited by this section." (Emphasis added.)

Petitioners argue that the contribution provisions in Measure 9 are targeted at the content of speech, *i.e.*, political support for a candidate, and thereby fall under the first level of Article I, section 8, scrutiny. They argue, further, that there is no historical or incompatibility exception to save those provisions. We agree.

All the listed provisions of Measure 9 either expressly limit, or ban outright, campaign contributions that may be given to or that may be accepted by a candidate. By

---

[22] In addition, section 3(2) limits the amount that minors can contribute to a "single election" to $25; section 3(3) limits—with certain exceptions—the amount that an individual can contribute in any one calendar year to any one political committee to $100; section 3(4) limits the amounts that a political committee of a political party may contribute to various state offices; and section 3(5) prohibits candidates, principal campaign committees, or other political committees from accepting contributions in excess of the limits in section 3.

their terms, those provisions are targeted at protected speech.

The Secretary of State does not argue for, nor are we aware of, any historical exception that removes those restrictions on expression from the protection of Article I, section 8. At the time of statehood and the adoption of Article I, section 8, there was no established tradition of enacting laws to limit campaign contributions.[23] Neither have we found any indication that, at the time of statehood, the possibility of excessive campaign contributions was considered a threat to the democratic process. No historical exception applies.

It also is clear that the provisions of Measure 9 do not specify in their operative texts any forbidden harms that the restrictions are designed to address. Nonetheless, Common Cause argues that the contribution provisions are targeted at proscribing a particular harm and that the harm can be inferred.

Recently, in *Stoneman*, this court had occasion to infer the harm that a criminal statute was designed to address. The criminal statute at issue in *Stoneman* made it a crime to pay to see actual or simulated reproductions of sexually explicit conduct by a person under the age of 18. We concluded that the statute was directed at the prevention of child abuse and that the restriction of otherwise protected expressive conduct did not violate Article I, section 8, because the statute was targeted not at the content of speech, but rather at the harmful effects necessarily generated by the acts that created that speech. 323 Or at 546-47. Of paramount importance to that holding was the fact that child abuse is a harm that properly is subject to government proscription and that such abuse *necessarily* had to occur in order to produce the expressive conduct in question. Neither of those criteria is present in this case.

---

[23] The earliest indication that we have found of Oregon's distrust of the role that money plays in the political process is the 1909 "Corrupt Practice Act Governing Elections." That Act prohibited certain corporations (such as banks and public utilities) from contributing to candidates. Title XXVII, ch. XII, § 3510. It also limited candidate expenditures to 15 percent of the annual salary for the elective office. *Id.* at § 3486.

■ Common Cause argues that the harm targeted by the contribution limitations is the existence of undue influence in the political process, or at least the appearance thereof. But it is not sufficient to select a phenomenon and label it as a "harm." Under Article I, section 8, the harm must be one that the legislature has a right to restrict or prohibit. *See, e.g., Stoneman,* 323 Or at 546-47 (illustrating what is required). We do not say that *all* influence obtained by contributions and expenditures is immune from permissibly being regulated or prohibited as harmful. But, where expressive conduct is involved, the legislative target must be clear and a legally permissible subject of regulation or prohibition, and the means chosen to deal with it must not spill over into interference with other expression. *See, e.g., City of Hillsboro v. Purcell,* 306 Or 547, 761 P2d 510 (1988) (invaliding city ordinance that forbade all door-to-door solicitations as overbroad).

■ Common Cause cites numerous studies as support for its position that large campaign contributions *can* create undue influence over the political process. But those studies, like the arguments in favor of Measure 9 in the Voters' Pamphlet, only establish that there is a debate in society over whether and to what extent such contributions indeed cause such a harm. As *Purcell* and *Stoneman* make clear, apart from the legal question whether Article I, section 8, prohibits enactment of the law as drafted for any purpose, the "harm" that legislation aims to avoid must be identifiable from legislation itself, not from social debate and competing studies and opinions. Measure 9 does not in itself or in its statutory context identify a harm in the face of which Article I, section 8, rights must give way.

We note, finally, that, if the purpose of the limitation simply is to improve the "tone" of campaigns, as Common Cause seems at bottom to be arguing, the constitutional answer must be even clearer: The right to speak, write, or print freely on any subject whatever cannot be limited whenever it may be said that elimination of a particular form of expression might make the electorate feel more optimistic about the integrity of the political process. A contrary result would make illusory the protections afforded by Article I, section 8.

This is not a case like *Stoneman*, where a form of expression could be limited in order to protect those children who necessarily were harmed by the act of creating that expression. Instead, we are asked to hold that legislation may forbid certain expression on the grounds that the intensity with which it is delivered will give it an unfair ability to succeed. Put baldly, Measure 9 proposes to foreclose certain expression because it *works*. We conclude that the contribution limitations imposed by Measure 9 are targeted at protected speech. We further conclude that success, without more, cannot be a proscribable harm. Therefore, those provisions can be saved only if there is a historical precedent for them or if those provisions proscribe a form of expression incompatible with political campaigns.

Both the Secretary of State and Common Cause argue that an "incompatibility" exception applies to laws regulating campaign finance and should remove the provisions of Measure 9 from the protection of Article I, section 8.[24] The Secretary reasons that the laws at issue in this case are analogous to those found constitutional by way of the incompatibility exception in *In re Fadeley*, 310 Or 548, 802 P2d 31 (1990). We disagree.

The Secretary of State asserts that *Fadeley* was based on this court's "profound" concern with "the stake of the public in a judiciary that is both honest in fact and honest in appearance." 310 Or at 563. The Secretary of State argues that the same justification should apply to the attempt of Measure 9 to ensure that nonjudicial elected officers are both honest in fact and in appearance. We disagree with the Secretary of State's attempt to treat *Fadeley* as a parallel to the present one.

In both *Fadeley* and the leading incompatibility case, *In re Lasswell*, 296 Or 121, 673 P2d 855 (1983), the

---

[24] The Secretary of State explicitly raised this argument in the context of expenditure limitations of Measure 9. However, the reasoning extends beyond the expenditure context and applies equally to contribution limitations. For instance, the Secretary of State asserts that "what candidates must do to obtain the enormous amounts of money spent in modern political campaigns has severely damaged the political system and more severely damaged the public's faith in that system." Common Cause argues that the incompatibility exception applies to both contributions and to expenditures.

court stressed that a professional's speech must actually vitiate the proper performance of the particular professional's official function, under the facts of the specific case. *See Fadeley*, 310 Or at 563-64; *Lasswell*, 296 Or at 126 (both illustrating proposition). Measure 9 does not satisfy the foregoing requirement. It does not address specific cases of official misconduct, and it cannot be contended that the expression in question (contributions) actually impairs performance of, *e.g.*, legislative functions in all cases. The *Fadeley* case thus provides no useful parallel to the case before us.

Shorn of its reliance on *Fadeley*, the Secretary of State's argument is a reiteration of the idea that money necessarily and inherently corrupts candidates. It is natural that support—financial and otherwise—will respond to a candidate's positions on the issues. Yet an underlying assumption of the American electoral system always has been that, in spite of the temptations that contributions may create from time to time, those who are elected will put aside personal advantage and vote honestly and in the public interest. The political history of the nation has vindicated that assumption time and again. The periodic appearance on the political scene of knaves and blackguards cannot, so far as we know, be tied to contributions more than to other forms of expression. There is no necessary incompatibility between seeking political office and the giving and accepting of campaign contributions. This argument is not well taken.

Having concluded that sections 3, 4, and 16 of Measure 9 are directed at protected expression under Article I, section 8, and that they restrict that expression, we hold that sections 3, 4, and 16 violate Article I, section 8, and are unconstitutional.[25]

---

[25] Petitioners claim that various parts of sections 3, 4, and 16 also violate Article I, sections 20, 21, and 26, of the Oregon Constitution. Because we conclude that those sections of Measure 9 violate Article I, section 8, we need not address petitioners' alternative theories. In addition, petitioners claim that sections 11, 14, 15, and 17, which operate pursuant to the contribution limits in section 3, also violate Article I, section 8. Because we invalidate those sections on subconstitutional grounds, 324 Or at 545-46, we need not consider those theories.

### b. Expenditure Provisions

Again, petitioners argue that the expenditure provisions in Measure 9 are targeted at the content of speech, fall under a first level Article I, section 8, analysis, and are not saved by any historical or incompatibility exceptions. The Secretary of State concedes that campaign expenditures are protected expression under Article I, section 8, but he contends that no provisions in Measure 9 restrict expenditures in any way that offends Article I, section 8. In the alternative, he argues that, if campaign expenditures are restricted in any way, they are restricted only minimally, and that the minimal restriction is warranted by the incompatibility exception.

We first address whether Measure 9 restricts expenditures. Section 6 of Measure 9 provides in part:

"(1) A candidate for statewide office or the office of state Senator or state Representative *may* file a declaration of limitation on expenditures * * * with the [Secretary of State] stating that the candidate, including the principal campaign committee of the candidate, will not make [expenditures in excess of certain amounts prescribed in the statute]."

(Emphasis added.) Petitioners concede that section 6, in and of itself, is a voluntary provision that does not restrict expenditures. The section gives a candidate the option of agreeing to self-imposed expenditure limits or, in the alternative, of rejecting those expenditure limits. However, petitioners argue that other provisions, which become operative if a candidate chooses not to limit his or her expenditures, have the effect of *coercing* the candidate into agreeing to restrict expenditures and that such coercion is, for constitutional purposes, the functional equivalent of forbidding the expenditures outright.

Petitioners single out parts of sections 13 and 19, asserting that they provide "penalties" for failure to agree to limit expenditures under section 6. Petitioners argue that those provisions, when considered together with section 6, impermissibly coerce candidates to agree to self-imposed campaign expenditure limits. Assuming without deciding that a statute that impermissibly coerces a candidate to

agree to self-imposed expenditure limits would amount to an unconstitutional violation of Article I, section 8, we conclude that those sections do not *impermissibly* coerce candidates. We analyze each challenged section in turn.

 Section 13(1) requires the Secretary of State to publish in the Voters' Pamphlet a statement as to whether a candidate has agreed to limit his or her expenditures pursuant to section 6. We hold that the provision is noncoercive for two reasons. First, the publication requirement does not by its terms inflict a punishment: No fines are imposed, nor is any other objective punishment directly or indirectly associated with the publication. Second, we have difficulty accepting the proposition, in the context of political campaigns, that the neutral reporting of this kind of objective truth—and that is all that the Secretary of State is authorized to do—somehow *impermissibly* burdens expression.[26]

Admittedly, a candidate's knowledge that his or her refusal to agree to expenditure limitations will be brought to the attention of the voters might persuade some candidates to agree to expenditure limits when, in the absence of that voter notification, they would not have agreed. Indeed, we assume that such a result was the precise purpose behind section 13(1). But encouraging such an outcome does not amount to impermissible coercion. The candidate's choice to limit or not to limit expenditures will be based on the candidate's estimate whether, in his or her particular campaign, a majority of voters so desire expenditure limitations that they might choose not to vote for a candidate who refuses to limit them. But such a calculation by a candidate, like a hundred other choices on public policy issues, is the essence of the political process.[27] Section 13(1) does not violate Article I, section 8.

---

[26] The Secretary of State argues that a truthful publication never can be found to violate Article I, section 8. We need not and do not adopt such a universal rule of law to resolve this case.

[27] Petitioners rely on a recent federal district court case that found a "voluntary" campaign expenditure limitation scheme coercive and in violation of protected free speech. *Shrink Missouri Government PAC v. Maupin*, 892 F Supp 1246 (ED Mo), *aff'd* 71 F3d 1422 (8th Cir 1995). The statutory scheme in that case required candidates to file affidavits stating whether or not they agreed to limit expenditures. Those candidates who refused the limitations were prohibited from accepting campaign contributions from PACs, corporations, labor unions and the like. It was this punishment—imposed only on those candidates who rejected the

■ Section 13(3) provides that, if a candidate has agreed to expenditure limits and then exceeds those limits during an election, then, if that candidate runs in a *later* election, the Secretary is required to publish in the Voters' Pamphlet for the later election a bold-faced notice that the candidate failed to abide by his or her promise to limit expenditures in the earlier election. Unlike section 13(1), this provision singles out a certain group of candidates. However, as is true of section 13(1), the provision only provides for publication of a truthful statement in the Voters' Pamphlet.

■ Even if there were a basis for holding that the publication by the Secretary of State under section 13(3) were some sort of "punishment"—a proposition that we reject— that publication still would be permissible and not run afoul of Article I, section 8. Oregon laws provide penalties for political candidates who mislead the public or engage in fraud. *See* ORS 260.355 (providing that a candidate may lose a nomination or political office for deliberate and material violation of election laws); ORS 260.532 (making it an offense for a candidate to make, or allow to be made, publication of a false statement of material fact during a campaign). *See also Cook v. Corbett*, 251 Or 263, 446 P2d 179 (1968) (overturning a primary nominating election because the winning candidate made false statements in the course of the campaign). Laws that are targeted at fraud do not violate Article I, section 8, because they constitute a historical exception to Article I, section 8. *Robertson*, 293 Or at 412.

Section 6 permits a candidate to promise not to exceed a specified amount of campaign expenditures. That promise then is published in the Voters' Pamphlet and may be relied on by voters in deciding for whom to vote. If a candidate reneges on that promise, he or she has misled the electorate.[28] Section 13(3) "punishes" a candidate—if at all—only

---

expenditure limitations—that the court found to be coercive and in violation of protected speech. No analogous punishment is present in section 13.

[28] The fact that a candidate may have intended to abide by expenditure limitations when he or she made the pledge, and only later decided to ignore that promise, does not make the failure to abide by the promise any less a fraud on the voters who have relied on the candidate's Voters' Pamphlet statement to choose their candidate.

for that misleading conduct and, for that reason, does not violate Article I, section 8.

■ We turn to section 19(4). That section provides that campaign contributors who contribute to candidates who have not agreed to abide by the campaign expenditure limitations under section 6 may not receive a tax credit for campaign contributions to that candidate. Contributors to candidates who have agreed to the limitation continue to receive a tax credit. Petitioners contend that that disparity has the indirect effect of punishing a candidate for not agreeing to the limitations. They argue that the legislation is premised on the idea that at least some campaign contributors either would not contribute, or would not contribute as much, but for the tax credit that accompanies their contribution, and that, faced with the threat of losing financial support from prospective contributors, it is reasonable to assume that at least some candidates will accept the lesser of two evils—from the candidate's perspective—and agree to the expenditure limitations.

Like many provisions of any tax code, section 19(4) is an attempt to encourage certain practices by rewarding those who follow them. Here, the effort is to encourage limited campaign expenditures. The reward is a tax credit. No less than the tax scheme it replaced, section 19(4) is, in effect, an indirect form of public campaign financing. No taxpayer is *entitled* to a tax credit for political contributions. The legislative choice to allow such a credit, but only under limited circumstances, does not appear to us to implicate Article I, section 8.

What is true with respect to contributors appears to us to apply *a fortiori* to those who receive contributions. The legislative choice to encourage certain behavior by tax policy violates no right of any potential recipient of contributions, because the recipient had no constitutional right to the contributions-with-tax-credits in the first place.

## B. *Viability of Remaining Provisions of Measure 9*

■ Having concluded that sections 3, 4, and 16 violate Article I, section 8, and are unconstitutional, we turn to section 23(2) of Measure 9. That section provides:

"If any part of this Act is held unconstitutional, the remaining parts shall remain in force unless the court specifically finds that the remaining parts, standing alone, are incomplete and incapable of being executed."

The section is a directive by the people to this court to conduct a "clean-up" function, *i.e.*, to examine the impact of our constitutional rulings on the balance of the provisions of Measure 9 and then to eliminate those additional sections of the measure that become ineffective as a consequence. We turn to that task.

The following provisions in Measure 9 only gain relevance from the contribution limitations imposed by sections 3, 4, or 16. Section 11 imposes fines for violations of sections 3, 4, or 16.[29] Section 14 defines various types of contributions for purposes of section 3. Section 15 defines a candidate's use of personal money as a contribution for purposes of section 3.[30] Finally, section 17 prohibits the "bundling" of contributions to circumvent the limitations established in section 3. We conclude that those sections are "incomplete and incapable of being executed" if—as we hold today—sections 3, 4, and 16 are unconstitutional. Therefore, we declare sections 11, 14, 15, and 17 void for lack of purpose.[31]

C. *Article I, section 26*

Petitioners claim that sections 6, 10, and 13 of Measure 9 also violate Article I, section 26,[32] of the Oregon Constitution.[33]

---

[29] Section 11 requires the Secretary of State or the Attorney General to impose a civil penalty not to exceed the greater of $1,000 or three times the amount of any contributions that violate sections 3, 4, or 16. It also holds a candidate personally liable for the civil penalty and, under certain conditions, it holds the directors of principal campaign committees jointly and severally liable for the civil penalty.

[30] In addition, the section imposes certain filing requirements when candidates receive certain contributions that exceed the limits imposed by section 3.

[31] Petitioners claim that several other sections should be declared void once the expenditure provisions have been struck down. Because we uphold the expenditure provisions, petitioners' claims necessarily fail.

[32] Article I, section 26, of the Oregon Constitution, provides:

"No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good; nor from instructing their Representatives; nor from applying to the Legislature for redress of greviances (sic)."

[33] Petitioners also claim that sections 3, 4, 11, 14, 15, 16, 17, and 19(4) violate Article I, section 26. Because we have voided those sections already on other constitutional or statutory grounds, we need not address those claims.

As we already have discussed, section 6 establishes the voluntary expenditure limit for each of the offices governed by the provisions of Measure 9, and section 13 provides for the publication in the Voters' Pamphlet of the candidate's agreement or refusal to abide by the expenditure limitations. In addition, section 10 authorizes the Secretary of State to impose civil penalties for violations of the voluntary limitations.

Petitioners assert that expression (under Article I, section 8) and association (under Article I, section 26) are "inseparable components of the same act." Therefore, they incorporate the same arguments that they raised under Article I, section 8, here as well. To the extent that petitioners' arguments do not assert any principled basis on which we could announce a different and more protective (to petitioners) scope to Article I, section 26, than that found in Article I, section 8, we conclude that our previous discussion under Article I, section 8, sufficiently indicates why sections 6, 10, and 13, on their face, do not violate Article I, section 26.

Petitioners also argue that sections 6, 10, and 13 of Measure 9, are unconstitutional for reasons unique to Article I, section 26. Article I, section 26, prohibits laws that restrain Oregonians from assembling together, peaceably, for the common good. Petitioners argue that several of the *contribution* sections limit free assembly. But they do not—and cannot—argue derivatively that the *expenditure*-related provisions—sections 6, 10, and 13—limit free assembly. We do not find petitioners' argument persuasive.

Article I, section 26, also prohibits laws that restrain Oregonians from instructing their representatives. Petitioners argue that contribution limits restrain the ability of Oregonians to instruct their representatives. Petitioners argue further, however, that expenditure limitations *indirectly* limit the ability of Oregonians to instruct their representatives, because meaningful instruction can be made only once Oregonians "learn a candidate's positions." We do not find that argument persuasive, because it is tied so clearly to the interests of both candidate and contributor in the concept of communication that it seems to us not to differ in principle from arguments already discussed under Article I, section 8.

Petitioners' arguments under Article I, section 26, are not well taken.

## D. *Article I, section 20*

Petitioners claim that sections 3(2), 3(3), 4(1)(a), 15, and 16 of Measure 9 violate Article I, section 20, of the Oregon Constitution.[34] Petitioners assert that those sections unequally immunize certain classes of citizens from restrictions on political speech, while singling out other classes for the restrictions. We decline to address those claims, because each of the challenged sections have been voided already on other constitutional or statutory grounds.

## E. *Vagueness Challenge*

Petitioners claim that section 17(2) of Measure 9 is unconstitutionally vague and, thereby, in violation of Article I, sections 20 and 21. We decline to address that claim because section 17(2) has been voided on statutory grounds.[35]

## F. *Attorney Fees*

■ Finally, petitioners request that, if they are successful on any of their claims, they be awarded attorney fees pursuant to this court's equitable powers described in *Deras*. It is true that, to some degree, the same "interest of the public in preservation of the individual liberties guaranteed against governmental infringement of the constitution" on which this court relied in awarding attorney fees in *Deras* is present in this case. 272 Or at 66. That, however, is not enough. *Deras* was a case in which the petitioner was attempting only to vindicate interests of the public at large. By contrast, some of the petitioners, both individual and institutional, who have brought the present proceeding are not so disinterested. Their victory may benefit many members of the public at large, but that is true of virtually any case involving the right

---

[34] Article I, section 20, of the Oregon Constitution, provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

[35] Petitioners also assert in a footnote that several other sections are unconstitutionally vague. Those challenges appear to have been either an afterthought or not important enough in petitioners' view to raise in text. We decline to address a constitutional challenge raised only by way of a footnote.

to speak, write, or print freely on any subject whatever. The overall benefit to the public is only an ancillary result in this case. Petitioners such as the political action committee and the potential political candidate have individualized and different interests that they seek to vindicate. Under such circumstances, this court ordinarily will decline to exercise its equitable power to award attorney fees. *See Dennehy v. Dept. of Rev.*, 308 Or 423, 781 P2d 346 (1989) (explaining the foregoing rationale for denying request for attorney fees in the context of a tax case that affected many taxpayers). The request for an award of attorney fees is denied.

## III. CONCLUSION

Sections 3, 4, 11, 14, 15, 16, and 17 of Measure 9 are declared void. The remainder of Measure 9 is not invalid on any ground urged by the petitioners in this proceeding.