Argued March 8, reversed April 11, 1950

## GUINN *v.* GUINN
217 P. (2d) 248

*Alan F. Davis,* of Portland, argued the cause and filed a brief for appellant.

*Stephen E. Parker,* of Portland, argued the cause and filed a brief for respondent.

Before Lusk, Chief Justice, and Brand, Belt, Bailey and Latourette, Justices.

LUSK, C. J.

The plaintiff obtained a decree awarding her a divorce from her husband, custody of their minor child and temporary alimony. The husband has appealed.

Plaintiff alleged in her complaint, as grounds for a divorce, that defendant had treated her "in a cruel and inhuman manner, making her life miserable, burdensome and unbearable and that some of said acts of cruelty are hereinafter more specifically set forth as follows:

"1. That defendant on numerous occasions has told plaintiff that he no longer loved her.

"2. That defendant on numerous occasions has told plaintiff to leave their home and not to return.

"3. That defendant refuses to converse with plaintiff for long periods of time.

"4. That defendant refuses to share with plaintiff any social life or activity and discourages any

attempt by plaintiff to enjoy the company of friends and acquaintances.

"5. That defendant has been niggardly and parsimonious with his money and by said action has forced plaintiff to work and produce income, even though defendant's earnings were sufficiently large to support the family.

"6. That defendant has struck plaintiff across the face, causing plaintiff to suffer physical injury and great mental pain and anguish.

"7. That defendant deliberately concealed from plaintiff, prior to their marriage, that he had been married on two former occasions."

■ The court made no specific findings (as we think should be done in a case of this kind), but in a letter to counsel announcing his decision stated, "We feel that sufficient of plaintiff's grounds for divorce has been established, such as defendant's failure to converse with her, and to join with her in social intercourse in their own home and in the homes of their own friends." The court also said, "The inharmony which developed between plaintiff and defendant was more attributable to the discrepancy in age than to any other cause. * * * The defendant lacked the tact and patience which might have overcome the conflicting attitudes and would have made for harmony and a successful marriage." Other than the foregoing, the court's memorandum found no fault in the defendant.

The parties were married May 9, 1946. He was forty-three; she was twenty-one. A boy was born to them March 27, 1947. On May 28, 1948, the plaintiff left her husband, but after an interval of three days, according to the plaintiff—of one night, according to the defendant—, he persuaded her to return. She left again on November 29, 1948, and on the same day filed this suit.

■ Until the birth of their son the parties seem to have enjoyed a reasonably happy married life. After that event there was discord, which appears to have been more or less continuous with the exception of a three-weeks period following their reconciliation in June, 1948. The mere fact that they did not get along does not, of course, justify the wife in seeking a divorce. Nor does the difference in their ages, which the circuit judge assigned as the principal reason for their difficulties. That difference is age existed at the time they exchanged their marital vows; to borrow an expression from another branch of the law, it was one of the risks Mrs. Guinn assumed when she took him "for better or for worse".

As in all other such cases, the question is: Whose fault was it that their marriage was a failure? Mrs. Guinn lays it principally to her husband's "morose" disposition and anti-social habits. He, on the other hand, says that there was too much social activity of the wrong kind; that his wife's family played too large a part in their lives; that there was too much drinking by the members of her family and their friends, and that Mrs. Guinn herself drank to excess. Due to these influences, he charges, she neglected him, her baby and her home, and these were the causes that brought unhappiness into their married life. He does not, however, himself seek a divorce, but believes that with the adoption by his wife of different habits of living they can keep their family intact and yet make a success of their marriage.

The evidence on behalf of the plaintiff fell far short of proving specifications No. 2 and No. 5 of her complaint. Her testimony is that her husband told her to leave their home, not "on numerous occasions", but on

one occasion, and this occurred at the time of their final quarrel on November 28, 1948, after she had announced her determination to leave. Her testimony contradicts, instead of proving, specification No. 5. She admitted on cross-examination that her husband denied her nothing. The evidence shows that he is an industrious man with a responsible job in the lumber business. His income during their marriage was around $4,000.00 a year except for a few months when he was out of work. It is shown without dispute that he was as generous with her as his means would permit, and that, instead of forcing her to work, he objected to her working and thought that she should be at home looking after the interests of her family.

Defendant had been twice divorced before he married the plaintiff. In support of specification No. 7 she testified that he told her about only one prior marriage. He contradicted this, and further testified that his prior marriages were a matter of record in the government office where they both worked at the time, and that she had access to these records. She did not deny the latter statement. Without attempting to resolve this conflict, it is sufficient to say that her testimony shows that it was a matter of indifference to her whether he had been married once or twice before, and that the incident did not take on importance until she decided to divorce him.

Specification No. 6 relates to an occurrence when they were both in bed with their baby and a controversy arose over which one should hold him. They had been drinking earlier in the evening, and he struck her on the face with the back of his hand. That is Mrs. Guinn's version. He testified that he could recollect no such incident, and denied that it ever occurred. Mrs. Guinn

testified that this was the only time he struck her and that the blow hurt her pride more than it hurt her physically. But, in an affidavit in support of a motion for an order restraining him from molesting her, filed at the time that the suit was commenced, Mrs. Guinn swore that "defendant on several occasions has struck and beaten me and inflicted upon me bodily injuries" and that she was "in fear that he will attempt to attack or molest me at the present time". There is absolutely nothing in the evidence to indicate that she was put in fear of her husband by the occurrence above described or by any other conduct on his part while they were living together.

The foregoing discrepancies in her testimony, and others which need not be specifically mentioned, seriously affect her credibility as a witness.

It would appear that plaintiff's real grievance was her husband's alleged unsociable nature and habits. To her complaints on this score and his defense against them most of the testimony in the 492-page transcript is directed. It would be of no value to the parties, the profession, or anyone else to attempt a detailed analysis of this testimony. We shall only state our conclusions based upon our examination of the record.

The trouble between the parties arose, not because Mr. Guinn shunned society, but because of his aversion to the particular type of social life which engrossed the time and attention of his wife, and his well-grounded fears that it constituted a threat to the peace of their home. That a great deal of drinking went on at the parties they attended is scarcely denied. The evidence about a birthday party at the home of friends of Mrs. Guinn is quite revealing. The hostess at this party, after testifying to the defendant's conduct on other

occasions when he ignored his wife and the company, swore that at the birthday party he did not speak to his wife and sat on the davenport and went to sleep. On cross-examination she admitted that the party "adjourned" at about four o'clock in the morning, and that about three-thirty or four in the morning Mr. Guinn took a nap. She proceeded: "It gave me the impression he was bored with the proceedings." Their child was asleep upstairs and they took him home at four-thirty or five in the morning. Under these circumstances, one may well understand that a man of normal interests and propensities might be bored with the proceedings without laying himself open to the charge that he was either anti-social or cruel to his wife.

Mrs. Guinn spent a great deal of the time at the home of her parents. Her father conducted a fuel business from his home, and in December, 1947, Mrs. Guinn went to work for her father as a bookkeeper. Mr. Guinn objected because he considered her place to be at home "looking out for her son, myself, and herself." That liquor flowed freely in the home of Mrs. Guinn's parents, the evidence does not leave in doubt. That Mrs. Guinn at times drank to excess we think is equally plain, not only from the testimony of her husband and other witnesses, but also from her answer to the question whether she was ever intoxicated during their married life, "Maybe I had one too many." She also admitted that her husband urged her to quit drinking, and objected to her spending so much time at her parents' home because of the continual drinking there and because he didn't want his boy in "that type of surroundings". She testified that he discontinued buying liquor, but that he drank when others offered it to him. She did not testify that she yielded to his urging that she quit drinking.

The defendant is himself no Puritan, and did not claim to be. But he probably handled his liquor better than she, and he unquestionably wished to get his family free of an atmosphere which appears to have been pretty well pervaded with the odor and the deteriorating influence of gin and whiskey. She was unwilling to meet him on that ground, and it is this, we think, which lies at the root of the breach between them.

This is not to acquit the defendant of all fault. He is, as we have said, a man of industrious habits. He is passionately devoted to his child, and he loved his home. But he might have made more concessions to his wife's desires and have been more generous toward her shortcomings. Many of their quarrels arose over her care of the child, and he may have been too critical of her at times, although the evidence is convincing that by her occasional neglect of the child she gave him cause for criticism. We do not suggest that, on the whole, she is not a good mother nor a good woman. Indeed, there is nothing in the record to support the view that there are grave defects in the character of either of them.

Mr. Guinn denied that he was unwilling to have people at their home or to visit at the homes of others. And, as to the charges that he was unsociable when others were around and that he refused to converse with his wife in their home, he testified: "It might appear I was morose when I wasn't happy, very unhappy, about her absence from the home so much, and the fact I couldn't get her interested staying at our home." We think that this testimony is true and reflects the situation in the home as it actually existed.

Marriage under our law is a civil contract in which the state has a vital interest. It is not to be dissolved by mutual agreement nor for light reasons. It is

still true that the integrity of the family is basic to our American civilization. "The public policy relating to marriage is to foster and protect it, to make it a permanent and public institution, to encourage the parties to live together, and to prevent separation." 9 R. C. L. 252, quoted with approval in *Hodler v. Hodler*, 95 Or. 180, 198, 185 P. 241, 187 P. 604. The marriage relation will be dissolved by the state for conduct of a spouse amounting to "cruel and inhuman treatment or personal indignities rendering life burdensome". § 9-907 (6), O. C. L. A., as amended by Oregon Laws 1949, Ch. 154. It is cruel and inhuman treatment for which Mrs. Guinn indicts her husband. These are strong words, much watered down in these days of easy divorce. But they certainly do not comprehend every slight defect of character in a husband or a wife, nor every lapse from the highest standard of marital conduct. They suggest rather a purpose of one spouse to injure the other, or such gross and callous want of consideration for the sensibilities and legitimate wishes and interests of the other as to amount in law to such a purpose.

■ Mr. Guinn may have made mistakes in his efforts to keep his family from breaking up. But the evidence does not justify a finding that in doing so he was either cruel or inhumane. By far the greater fault was on her side, for she was unwilling to forego her indulgences for the greater good of a home. Whether, with a better will on her part, this marriage may yet be saved is not the test of the court's decision. It is our function to weigh the evidence in the light of the law for the purpose of ascertaining if the charges have been sustained. We think they have not been, and the decree must, therefore, be reversed.

Neither party will recover costs or disbursements.