Argued July 8, reversed October 14, 1959
ABBOTT, Guardian *v.* O'HAIR
344 P. 2d 922

*Donald A. W. Piper,* Klamath Falls, argued the cause for appellant. With him on the brief was Arthur A. Beddoe, Klamath Falls.

*R. B. Maxwell,* Klamath Falls, argued the cause for respondent. On the brief were Maxwell & Goddard.

Before McAllister, Chief Justice, and Perry, O'Connell and Crawford, Justices.

PER CURIAM

The plaintiff Juanita O'Hair brought suit for divorce from the defendant Keith O'Hair. It appears from the testimony of the plaintiff that at the time she commenced this action she was under the impression she was then on parole from the Oregon State Hospital, but at the time of trial the parole had expired. The plaintiff in her complaint sought a divorce on the grounds of extreme cruelty and sought disposition of property rights.

The defendant denied any acts of cruelty and by cross-complaint sought a divorce on the same grounds, asking also that he be adjudged the owner of the property accumulated by the parties.

The trial court granted the defendant's prayer for divorce, made disposition of the property, and granted him the custody of the two minor children of the parties. From this decree the plaintiff appeals.

The record discloses that the parties were married in Indiana in August, 1932; that the defendant was a licensed mortician and the plaintiff a registered nurse. They came to Oregon in 1934, residing for a short time in Portland, then moved to McMinnville; they then went to Woodburn where the defendant managed a funeral home and the plaintiff worked at times as a nurse. They remained in Woodburn for approximately four years and here their children were born. From Woodburn they moved to Camas, Washington, and succeeded in purchasing a mortuary in that city.

The married life of the parties during all of this time appeared to be quite normal except for two oc-

currences. The first occurred when the defendant was suffering some nervous disorder and the plaintiff called a physician who prescribed a barbiturate. The plaintiff, not feeling well, began using the prescription for over a period of about three or four weeks and suddenly collapsed. The defendant then accused the plaintiff of using drugs and alcohol excessively. She testified he told her he had evidence of this fact "locked up in the vaults in the bank." That during this time the defendant left lying on the desk a sealed envelope with the words, "To be opened by my wife in case of death," written thereon. She did not then open the envelope, but later found the torn letter in a basket and read it. It charged she had been "unfaithful" with men and used alcohol and drugs excessively, closing with the words, "Just in case of death, I remain, Keith." Plaintiff also testified there were other notes written in a similar vein, and she stated there were no grounds for accusing her of unfaithfulness. The defendant does not deny that he wrote such notes.

The second occurrence happened about a year later. The plaintiff's version is that she purchased some Dr. Miles' Nervine, which is sold without prescription, and took this patent medicine because she was starting into her menopause and there were times when she was tense and did not feel good. She states that when her husband discovered she was taking the nervine "then he came home and came upstairs and he had written a check for $100, and he said, 'there, I never want to see you again. See what I found. I have taken it to Lewis [the family physician],' and he just blew his top."

The defendant's version of this occurrence is quite different. He states:

"I discovered in the medicine cabinet the bromide which she was using at that time. Our family

physician called me and said he wanted to talk to me. She must have heard him call on the extension phone because when I returned from my conference with the physician her first question was, 'What did Dr. Carpenter want to talk to you about?' My answer was, 'You.' 'Well, what was it about?' And I says, 'About your taking Dr. Miles' Nervine. If you don't stop it you will be back in a sanitarium or hospital.'

\* \* \* \* \*

"She immediately went up to her bedroom and packed some bags and said, 'I'm leaving.' And I, of course, having gone through this once before was hurt and angry, and I possibly told her I didn't care, if that is the way she felt about it. I went downstairs and wrote a check for $100.00 for her. I did not tell her that being close to the first of the month it was almost the last $100.00 I had in my checking account or had about me. She didn't know that and has never been told until this moment.

\* \* \* \* \*

"I asked her if there was some place I could take her. She said, 'Yes, take me to Portland.' I took her to Portland to the Greyhound Bus Depot. I was parked in front in a loading zone, and she took her bags and went inside. I helped her in with them, but I had to get out of the loading zone. I asked her if there was anything I could do. She said, 'I can take care of myself.' As I left I saw her stepping into the drugstore. What she did in there I don't know."

The plaintiff then went to her mother's home in San Francisco, California. She testified that she awoke the second night she was there and screamed; that her mother became frightened and called the police and she was taken to the State Hospital at Napa, California. After several months of treatment she returned to the home in Camas.

In 1949 the parties sold their business in Camas and

purchased a "funeral home" in Klamath Falls, Oregon. The family life of the parties appears, generally, to have been quite normal at Klamath Falls until in 1953 when the plaintiff received word her mother was not well and she went to California. Here again she became ill and was taken to the California State Sanitarium where she remained six to eight weeks. The plaintiff then returned to the home in Klamath Falls and the family relationship continued until that fall when the plaintiff again became ill and was taken to the Oregon State Hospital where she remained until her release on parole.

■ As a basis for a divorce on the grounds of extreme cruelty, the defendant's uncorroborated testimony is that plaintiff drank alcoholic beverages to excess while at parties and embarrassed him. He stated: "She would become more or less intoxicated and then make, go around where the other women's husbands were, put her arms around them, kiss them, tell dirty stories." The evidence discloses the defendant accompanied the plaintiff, partook of the refreshments and never protested to the plaintiff concerning her actions.

The defendant also states the plaintiff told him "That when the children were grown she would seek a divorce, that we would not live together."

These claims of extreme cruelty seem to have been an afterthought of the defendant and were not taken with any degree of concern at the time they occurred for when asked by his own counsel whether or not he felt he could ever resume cohabitation with the plaintiff he replied: "I do not. Since this suit has been started and the correspondence I have received from her and read that others received, I do not feel that we could live together at all."

The defendant also charges as extreme cruelty that the plaintiff since her parole from the State Hospital has refused to return to her husband and has insisted upon living separate and apart from him. The record fully discloses that the defendant upon plaintiff's parole from the State Hospital did not wish her to return.

■ This record discloses no grounds for divorce, but instead discloses an estrangement of the family relation which has been brought about through the illness of the plaintiff, and this is not a ground for divorce in this state.

There is nothing in this case that shows a desire of either spouse to injure the other or show such "gross and callous want of consideration for the sensibilities and legitimate wishes and interests of the other as to amount in law" to extreme cruelty. *Guinn v. Guinn,* 188 Or 554, 562, 217 P2d 248; *Gibson v. Gibson,* 216 Or 622, 340 P2d 190.

The relief sought by both parties must be denied because of lack of proof of misconduct justifying a divorce.

Reversed.