Argued and submitted March 3, decision of Court of Appeals reversed, and case remanded to Court of Appeals for further proceedings December 24, 2009

David SCHMIDT,
*Petitioner on Review,*

*and*

N. M.,
*Plaintiff,*

*v.*

MT. ANGEL ABBEY,
an Oregon not for profit corporation,
*Respondent on Review,*

*and*

ARCHDIOCESE OF PORTLAND
IN OREGON,
an Oregon corporation;
Roman Catholic Archbishop of Portland in Oregon,
dba Archdiocese of Portland in Oregon
and Roman Catholic Archbishop of Portland in Oregon,
and successors,
a corporation sole;
and Louis Charvet, deceased,
*Defendants-Respondents,*

*and*

SWISS-AMERICAN CONGREGATION OF THE
ORDO SANCTI BENEDICTI,
*Defendant.*

(CC 020403531; CA A124850; SC S056261)

223 P3d 399

Walters, J., concurred and filed opinion.

Kathryn H. Clarke, Portland, argued the cause for petitioner on review. Erin K. Olson, Law Office of Erin Olson PC, Portland, filed the brief for petitioner on review.

Lisa E. Lear, Bullivant Houser Bailey PC, Portland, argued the cause and filed the brief for respondent on review.

With her on the brief were Richard J. Whittemore and Beth Cupani.

Walter J. Ledesma, Woodburn, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

BALMER, J.

Walters, J., concurred and filed an opinion.

**BALMER, J.**

This tort action requires us to consider the proper interpretation of the terms "sexual exploitation" and "cruelty" as used in ORS 12.117, which extends the statute of limitations for certain tort actions. Plaintiff's complaint alleges that, while plaintiff was a student at Mt. Angel Seminary, a priest questioned plaintiff about sexuality and reproduction and began masturbating under his cassock while plaintiff was present. Plaintiff averred that the priest's actions constituted a tort and caused him physical and emotional harm, and, for present purposes, defendant does not dispute those allegations. Defendant, however, moved for summary judgment, arguing that plaintiff's claim was time-barred and that ORS 12.117 did not extend the statute of limitations because the priest's alleged conduct was neither "sexual exploitation" nor "cruelty" within the meaning of that statute. The trial court agreed and granted defendant's motion for summary judgment. Plaintiff appealed, and the Court of Appeals affirmed. *Schmidt v. Archdiocese of Portland in Oregon*, 218 Or App 661, 180 P3d 160 (2008). For the reasons set out below, we reverse the decision of the Court of Appeals and remand the case to that court for further proceedings.

Because this case comes to us on summary judgment, we view the facts and all reasonable inferences that may be drawn from those facts in the light most favorable to the nonmoving party—here, plaintiff. *See Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 332, 83 P3d 322 (2004) (stating standard). In 1958, when plaintiff was a high school freshman at Mt. Angel Seminary, Father Charvet—plaintiff's freshman advisor—asked plaintiff to meet Charvet in his office at a specific time. When plaintiff arrived, Charvet was sitting behind his desk and told plaintiff to stand in front of the desk. Charvet then began questioning plaintiff as to what he knew about sexuality and reproduction. Among other things, Charvet asked plaintiff whether he had ever masturbated and explained to plaintiff "what that was about." At that point, Charvet became "less technical" and began using "street or gutter talk as opposed to clinical [terms]." During Charvet's questioning, plaintiff "could see that there was a lot of motion going on under his cassock," and, according to plaintiff, it was "pretty obvious" that

Charvet was masturbating. Although Charvet never instructed plaintiff to remain in the room, plaintiff stated that his training as a student in the seminary prevented him from leaving and that he "felt in a locked situation." The incident lasted approximately 30 to 45 minutes.

In 2002, plaintiff filed this action against Charvet and Mt. Angel Abbey, Charvet's employer, seeking damages for intentional infliction of emotional distress and for breach of a fiduciary duty.[1] As noted, defendant moved for summary judgment, arguing that plaintiff's action was barred by the statute of limitations. Defendant argued that ORS 12.117(1),[2] which extends the statute of limitations for tort actions based on conduct that constitutes "child abuse," did not apply because Charvet's alleged conduct was not "child abuse" within the meaning of that statute.[3] Plaintiff

---

[1] Plaintiff also asserted a claim against the Archdiocese of Portland and Mt. Angel Abbey for sexual battery arising out of an incident where a different priest (Father Frank) allegedly had sodomized plaintiff. The trial court granted summary judgment on that claim, concluding that the evidence was insufficient to support *respondeat superior* liability for Father Frank's conduct. The Court of Appeals agreed. *Schmidt v. Archdiocese of Portland in Oregon*, 218 Or App 661, 696, 180 P3d 160 (2008). We limited our review of the Court of Appeals decision to the statute of limitations issue, ORAP 9.20(2), and therefore express no opinion as to the *respondeat superior* issue. Because plaintiff's claims against the archdiocese related only to the incident involving the other priest, the archdiocese is not a party on review. Additionally, in November 2008, this court granted plaintiff's stipulated motion to dismiss plaintiff's claims against Charvet individually. As a result, the only respondent on review is Mt. Angel Abbey.

[2] ORS 12.117(1) provides:

"Notwithstanding ORS 12.110, 12.115 or 12.160, *an action based on conduct that constitutes child abuse* or conduct knowingly allowing, permitting or encouraging child abuse accruing while the person who is entitled to bring the action is under 18 years of age shall be commenced not more than six years after that person attains 18 years of age, or if the injured person has not discovered the injury or the causal connection between the injury and the child abuse, nor in the exercise of reasonable care should have discovered the injury or the causal connection between the injury and the child abuse, not more than three years from the date the injured person discovers or in the exercise of reasonable care should have discovered the injury or the causal connection between the child abuse and the injury, whichever period is longer."

(Emphasis added.) The legislature amended ORS 12.117(1) in the 2009 legislative session in ways unrelated to our analysis. *See* Or Laws 2009, ch 879 (setting out amendments).

[3] Defendant does not challenge plaintiff's contention that the other requirement of ORS 12.117 is met—*i.e.*, that plaintiff, exercising reasonable care, did not "discover[ ] the injury or the causal connection between the injury and the child abuse" more than three years before bringing this action.

responded that Charvet's conduct fell within two examples of child abuse enumerated in ORS 12.117(2).[4] Plaintiff argued that the conduct was covered by ORS 12.117(2)(a)(B), which defines as child abuse any "[i]ntentional conduct by an adult that results in * * * [a]ny mental injury to a child which results in observable and substantial impairment of the child's mental or psychological ability to function caused by *cruelty to the child,* with due regard to the culture of the child." (Emphasis added.) Plaintiff also argued that Charvet's conduct came within ORS 12.117(2)(d), which provides that child abuse includes

> *"[s]exual exploitation of a child,* including but not limited to:
>
> "(A)   Conduct constituting [a] violation of ORS 163.435 and any other conduct which allows, employs, authorizes, permits, induces or encourages a child to engage in the performing for people to observe or the photographing, filming, tape recording or other exhibition which, in whole or in part, depicts sexual conduct or contact; and
>
> "(B)   Allowing, permitting, encouraging or hiring a child to engage in prostitution, as defined in ORS chapter 167."

---

[4] ORS 12.117(2) provides:

"As used in subsection (1) of this section, 'child abuse' means any of the following:

"(a)  Intentional conduct by an adult that results in:

"(A)  Any physical injury to a child; or

"(B)  Any mental injury to a child which results in observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child, with due regard to the culture of the child;

"(b)  Rape of a child, which includes but is not limited to rape, sodomy, unlawful sexual penetration and incest, as those acts are defined in ORS chapter 163;

"(c)  Sexual abuse, as defined in ORS chapter 163, when the victim is a child; or

"(d)  Sexual exploitation of a child, including but not limited to:

"(A)  Conduct constituting [a] violation of ORS 163.435 and any other conduct which allows, employs, authorizes, permits, induces or encourages a child to engage in the performing for people to observe or the photographing, filming, tape recording or other exhibition which, in whole or in part, depicts sexual conduct or contact; and

"(B)  Allowing, permitting, encouraging or hiring a child to engage in prostitution, as defined in ORS chapter 167."

(Emphasis added.) The trial court agreed with defendant that Charvet's actions did not come within either of those provisions and therefore did not constitute "child abuse" as defined in ORS 12.117. Accordingly, the trial court concluded that plaintiff's action was barred by the statute of limitations and granted defendant's motion for summary judgment.

Plaintiff appealed, and the Court of Appeals affirmed, holding that the statute of limitations extension did not apply and that plaintiff's claims therefore were time-barred. The majority agreed with the trial court that Charvet's actions did not constitute "cruelty" or "sexual exploitation" as those terms are used in ORS 12.117(2). Judge Edmonds dissented in part,[5] concluding that Charvet's conduct constituted "cruelty" under ORS 12.117(2)(a)(B). We begin with a discussion of whether a reasonable factfinder could find that Charvet's conduct falls within the "cruelty" provision of ORS 12.117(2)(a)(B). We then consider whether a reasonable factfinder could find that Charvet's conduct constitutes "sexual exploitation" under ORS 12.117(2)(d).

As noted, under ORS 12.117(2)(a)(B), an action is subject to the extended statute of limitations if it is based on conduct that (1) is intentional, (2) results in a mental injury to the child that results in "observable and substantial impairment of the child's mental or psychological ability to function," and (3) constitutes "cruelty to the child." Defendant does not argue that Charvet's conduct was not intentional or that plaintiff did not suffer the requisite mental injury; instead, defendant argues only that Charvet's conduct was not "cruelty to the child." We therefore limit our analysis of ORS 12.117(2)(a)(B) to that issue, turning first to the analysis of the Court of Appeals.

The majority initially looked to dictionary definitions of "cruelty" and "cruel" and determined, based on those definitions, that the phrase "cruelty to the child" has several possible meanings. The majority began with the question whether the term "cruelty" refers to the mental state of the

---

[5] Judge Edmonds concurred in the majority's decision regarding the incident involving the other priest. As noted, we do not address that issue on review.

person engaging in the conduct or to a particular type of conduct. Because ORS 12.117 applies to "action[s] based on conduct that constitutes child abuse" and generally defines child abuse in terms of conduct, the majority determined that the phrase "cruelty to the child" refers to a type of conduct rather than to a particular mental state. The majority then turned to an analysis of the nature of that conduct.

The majority determined, after analyzing the plain meaning of "cruel," that the term refers to relatively extreme or severe conduct; however, because the precise nature of the conduct was still unclear, the majority examined legislative history.[6] That history demonstrated, in the majority's view, that the legislature intended "cruelty" to encompass a "narrow" range of severe or extreme conduct and that, generally speaking, the legislature was concerned with verbal conduct—such as shouting at a child—that occurs repeatedly. Finally, because the meaning of the phrase "cruelty" was still unclear, the majority looked to the general purpose of the statute. Although the primary purpose of the statute was the protection of children, the majority determined that the legislature had "made a significant effort to enact specific, detailed criteria giving rise to * * * the entitlement to an extended limitations period," again demonstrating that it intended the word "cruelty" to refer to "a narrow range of extreme or severe conduct." *Schmidt*, 218 Or App at 681-82. Ultimately, the majority concluded that, given the nature of Charvet's conduct, including the fact that the masturbation itself lasted only 10 minutes and occurred on only one occasion, a reasonable jury could not have found that that conduct constituted "cruelty to [a] child." *Id.* at 682-83.

Judge Edmonds dissented from the majority's holding that Charvet's conduct did not constitute "cruelty to [a] child" under the statute. He concluded that, in 1989, when the legislature enacted ORS 12.117(2)(a)(B), "cruelty" had a well-defined legal meaning. Looking to case law that existed

---

[6] The legislature took the text of ORS 12.117(2)(a)(B) almost verbatim from *former* ORS 418.740 (1987), *repealed by* Or Laws 1993, ch 546, § 141, and *renumbered as* ORS 419B.005 (1993), the statute defining "abuse" for purposes of mandatory child abuse reporting. The majority therefore looked to the legislative history of *former* ORS 418.740. *See Schmidt*, 218 Or App at 675-76 (explaining legislative history).

when ORS 12.117 was enacted and the definition of "cruelty" contained in *Black's Law Dictionary* at that time, the dissent concluded that the legislature intended to include two categories of conduct with the phrase "cruelty to [a] child": (1) conduct that was "specifically intended to inflict harm on a child by an actor" and (2) acts that "by their very nature expressed a wanton disregard for the welfare of the child such that they evidenced an 'evil mind.' " *Schmidt*, 218 Or App at 701-02 (Edmonds, J., concurring in part and dissenting in part). Judge Edmonds then concluded, "[a]s a matter of common sense," that masturbating in front of a child is the kind of conduct that by its very nature "evidenc[es] a wanton disregard for the welfare of the child and an 'evil mind.' " *Id.* at 704.

■     We begin, as the Court of Appeals did, with the text of the statute, specifically, the term "cruelty." As the majority noted, that term could refer to conduct that is performed with a purpose of inflicting pain or injury or to conduct that is by its very nature "inhuman" or causes extreme pain or distress. *See Schmidt*, 218 Or App at 672 (describing dictionary definitions).[7] The majority concluded that it must choose between those two general interpretations and selected the latter after a text and context analysis. We do not find it necessary, however, to choose between the two. Rather, for the reasons set out below, we conclude that a person has engaged in "cruelty to [a] child" when that person engages in conduct with the specific intent of injuring or harming the child and the conduct is capable of producing those results *or* when the person engages in conduct toward the child that is so extreme or severe that the act demonstrates a willful and wanton disregard for the welfare of the child.

---

[7] The majority also noted an alternative dictionary definition: "causing or conducive to injury, grief, or pain." *Schmidt*, 218 Or App at 672 (quoting *Webster's Third New Int'l Dictionary* 546 (unabridged ed 2002)). However, ORS 12.117(2)(a)(B) requires, by its terms, that "cruelty" cause "mental injury" to the child that "results in observable and substantial impairment of the child's mental or psychological ability to function." We cannot interpret the term "cruelty" as referring to *any* act that causes injury because, were we to use that interpretation, the term would add nothing to the meaning of the statute that is not conveyed by the other words. *See* ORS 174.010 ("[W]here there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all.").

In concluding that the term "cruelty" referred only to the specific nature of the conduct, the Court of Appeals' majority noted that ORS 12.117, as a whole, is concerned with specific "conduct," rather than with the mental state of the person who engages in that conduct. We agree that, as a general matter, ORS 12.117 defines "child abuse" in terms of conduct. Nonetheless, nothing in the statute suggests that the legislature was concerned *only* with "conduct" and not also with the intent of the actor. Indeed, other provisions of the statute suggest precisely the opposite. For instance, under ORS 12.117(2)(c), the term "child abuse" is defined as including "[s]exual abuse, as defined in ORS chapter 163, when the victim is a child." To commit third-degree sexual abuse, the actor must touch the victim's "intimate parts * * * for the purpose of arousing or gratifying the sexual desire of either party." ORS 163.305 (so defining "sexual contact"); *see* ORS 163.415 (defining third-degree sexual abuse in terms of "sexual contact"). In other words, determining whether a specific act constitutes "child abuse" under ORS 12.117(2)(c) requires an analysis of both the nature of the act itself and the actor's purpose or mental state. Similarly, as discussed below, "sexual exploitation" under ORS 12.117(2)(d) requires that the actor use the child for his or her own profit or advantage, again requiring an investigation into the actor's purpose in addition to the nature of the conduct itself.

An interpretation of the term "cruelty" that includes consideration of the mental state of the actor, rather than solely the nature of the conduct itself, is supported by this court's interpretation of that term in other contexts prior to the enactment of ORS 12.117(2)(a)(B). For instance, in *Chaffin v. Chaffin*, 239 Or 374, 387, 397 P2d 771 (1964), this court held that an "act of cruelty" by a parent towards a child—but not a mere negligent act—would permit a right of action against the parent. The court further described such an act of "cruelty" as "an act which is done with an intention to injure the child *or* is of such a cruel nature in and of itself as to evidence not a reasonably normal parental mind, but an evil mind."[8] *Id.* (emphasis added).

---

[8] As Judge Edmonds noted in his dissent, the Court of Appeals later used the *Chaffin* test to interpret the phrase "cruelty" as used in *former* ORS 416.030(2)(c)

This court has similarly interpreted the term "cruel" in the context of divorce proceedings. Before 1971, an individual seeking a dissolution of marriage was required to assert one of several "causes" for the dissolution, among them "[c]ruel and inhuman treatment" by his or her spouse. *Former* ORS 107.030 (1969), *repealed by* Or Laws 1971, ch 280, § 28. This court interpreted that phrase as indicating "a purpose of one spouse to injure the other, *or* such gross and callous want of consideration for the sensibilities and legitimate wishes and interests of the other as to amount in law to such a purpose." *Guinn v. Guinn,* 188 Or 554, 562, 217 P2d 248 (1950) (emphasis added); *see also Nelson v. Nelson,* 221 Or 117, 119, 350 P2d 702 (1960) (same).

We conclude, based on the context described above, that the term "cruelty to [a] child," as used in ORS 12.117(2)(a)(B), most reasonably is interpreted to include (1) acts that are performed with the specific intent of injuring or harming the child and that are capable of producing those results and (2) acts that, by their very nature, demonstrate a willful and wanton disregard for the child's welfare, such that one can infer a willingness to have the child injured.

■     Applying that standard, a jury could reasonably determine, based on the relationship between Charvet and plaintiff and the nature of the conduct at issue, that Charvet's actions toward plaintiff fall within the "cruelty" provision of ORS 12.117(2)(a)(B). Charvet was a priest—a celibate spiritual adviser and leader—and was plaintiff's freshman advisor and dormitory proctor while the 14-year-old plaintiff attended seminary. Plaintiff presented evidence that Charvet, using his position as a priest and advisor, summoned plaintiff to his office, where Charvet engaged in an explicit explanation of sexuality and masturbated while plaintiff watched.[9] Because of his training in the Catholic

_____

(1987), *repealed by* Or Laws 2001, ch 900, § 261, which dealt with exemptions from liability concerning public assistance payments. *See Kerr v. Welfare Comm.,* 3 Or App 27, 31, 470 P2d 167, *rev den* (1970), *cert den,* 402 US 950 (1971) (so interpreting "cruelty").

[9] Defendant argues that plaintiff's statements regarding Charvet's masturbation are insufficient to create an issue of material fact because it is "mere speculation" that Charvet actually masturbated. Defendant points to the fact that plaintiff stated at one point in his deposition that he had "assumed" that Charvet was

church, plaintiff felt that he could not leave the room and therefore remained there for 30-45 minutes. Because of the duration of the encounter, the nature of Charvet's conduct and its potential for inflicting severe emotional injury, and the nature of Charvet and plaintiff's relationship, we conclude that a reasonable trier of fact could find that the conduct described above demonstrates a wanton disregard for plaintiff's welfare and a willingness to have plaintiff suffer psychological harm as a result of Charvet's acts. There is therefore sufficient evidence to create an issue of material fact as to whether Charvet's conduct constituted "cruelty to [a] child."

We turn next to plaintiff's claim that Charvet's conduct constituted "sexual exploitation" as that term is used in ORS 12.117(2)(d). As discussed above, ORS 12.117(2)(d) provides that "child abuse" means, among other things, "[s]exual exploitation of a child, including but not limited to [three specific examples]." As a result, the Court of Appeals rejected plaintiff's argument that it should rely on the "common sense" meaning of the words "sexual" and "exploitation," stating that "where the legislature has provided that a general term 'includ[es] but [is] not limited to' expressly enumerated items—here, specific types of conduct—that is not the applicable textual analysis." *Schmidt*, 218 Or App at 684-85 (alterations in original). Instead, the majority applied the principle of *ejusdem generis*—that is, the majority construed "sexual exploitation" by analyzing the "basic characteristics" of the enumerated examples. *Id.* at 683.

The majority first examined ORS 163.435[10]—contributing to the sexual delinquency of a minor—which is

_____

masturbating. However, plaintiff also testified that he could see "a lot of motion going on," that "[i]t went on for a long time," that it was "pretty obvious" that Charvet was masturbating, and that plaintiff therefore had concluded that Charvet was masturbating. On this record, there is a genuine dispute as to that material fact, among others, that cannot be decided on summary judgment.

[10] ORS 163.435(1) provides:

"A person 18 years of age or older commits the crime of contributing to the sexual delinquency of a minor if:

"(a) Being a male, he engages in sexual intercourse with a female under 18 years of age; or

"(b) Being a female, she engages in sexual intercourse with a male under 18 years of age; or

the first example of "sexual exploitation" listed in ORS 12.117(2)(d). A basic characteristic of the activities comprising the crime of contributing to the sexual delinquency of a minor, the majority determined, is "sexual intercourse—that is, actual sexual contact—between the perpetrator and the victim." *Schmidt*, 218 Or App at 683. Next, the majority examined the second example of "sexual exploitation" listed within the statute: "conduct which allows, employs, authorizes, permits, induces or encourages a child to engage in the performing for people to observe or the photographing, filming, tape recording or other exhibition which, in whole or in part, depicts sexual conduct or contact[.]" ORS 12.117(2)(d)(A). That example, the majority explained, includes only actions that are "directed at causing a child to perform sexual conduct or contact or to participate in the 'exhibition' of such conduct or contact." *Schmidt*, 218 Or App at 684. Because the record in this case did not demonstrate that Charvet had engaged in sexual intercourse with plaintiff or that Charvet had encouraged plaintiff to perform sexual conduct or contact or to participate in the exhibition of such conduct or contact, the majority determined that a jury could not find that Charvet had sexually exploited plaintiff.[11] *Id.*

On review, plaintiff renews his argument that the ordinary meaning of the term "sexual exploitation" is broad enough to cover Charvet's conduct. Defendant responds that the Court of Appeals correctly interpreted that term by using the principle of *ejusdem generis* and determining its meaning, in part, by examining the specific examples that follow the term. The issue on review, then, is the correct interpretation of the term "sexual exploitation" as used in ORS 12.117(2)(d).

Plaintiff begins by pointing to the plain and ordinary meaning of the term "sexual exploitation." *See State v. Briney*, 345 Or 505, 511, 200 P3d 550 (2008) (court gives words of common usage their plain, ordinary meaning). The

---

"(c) The person engages in deviate sexual intercourse with another person under 18 years of age or causes that person to engage in deviate sexual intercourse."

[11] The court did not address the third example in the statute: "[a]llowing, permitting, encouraging or hiring a child to engage in prostitution, as defined in ORS chapter 167." *See* ORS 12.117(2)(d)(B) (providing example).

dictionary defines "exploitation" as "an unjust or improper use of another person for one's own profit or advantage." *Webster's Third New Int'l Dictionary* 801-02 (unabridged ed 2002).[12] Plaintiff asserts that Charvet's conversation with plaintiff and his masturbation in plaintiff's presence constitute "an unjust or improper use" of plaintiff in a sexual way for Charvet's own "advantage." According to plaintiff, the inquiry should end at that point. He argues that the Court of Appeals erred in limiting the plain meaning of "sexual exploitation" to encompass only conduct that is similar to the specific examples listed in the statute and that the principle of *ejusdem generis* should not be applied to ORS 12.117.

■■ We agree with plaintiff that the appropriate starting point is the ordinary meaning of "sexual exploitation." However, we disagree with plaintiff's assertion that the dictionary is the only source we should consider in interpreting that term. We consider not only the dictionary definition of the terms that the legislature chooses to use, but also the context in which those terms are used. When, as here, the legislature uses a general term in a statute and also provides specific examples, those specific examples provide useful context for interpreting the general term.

For example, in *Vannatta v. Keisling*, 324 Or 514, 533, 931 P2d 770 (1997), we used the principle of *ejusdem generis* in determining whether the legislature had authority under the Oregon Constitution to enact laws that restricted campaign contributions and expenditures. The relevant constitutional provision granted the legislature the authority to enact laws prohibiting "all undue influence [in elections], from power, bribery, tumult, and other improper conduct." *Id.* at 528. As noted, we applied the principle of *ejusdem generis* and concluded that the phrase "other improper conduct" referred only to improper conduct "of the same kind" as that in the specific examples. *Id.* at 533.

■ Again, in *Lewis v. CIGNA Ins. Co.*, 339 Or 342, 351, 121 P3d 1128 (2005), we used the principle of *ejusdem generis* to examine the correct interpretation of a statute that imposed a penalty for failing to cooperate with "personal and

---

[12] There are other definitions, none of which applies to this case.

telephonic interviews and other formal or informal information gathering techniques." In deciding that the phrase "other * * * information gathering techniques" did not include independent medical examinations, we relied, in part, on the principle of *ejusdem generis*:

> "[The relevant statute] lists 'personal and telephonic interviews' as examples of 'formal and informal information gathering techniques,' which suggests that 'information gathering techniques' in this context share the basic characteristics of personal and telephonic interviews. '[W]hen the legislature chooses to state both a general standard and a list of specifics, the specifics do more than place their particular subjects beyond the dispute; they also refer the scope of the general standard to matters of the same kind, often phrased in Latin as *"ejusdem generis."* ' "

*Id.* at 350 (quoting *Bellikka v. Green*, 306 Or 630, 636, 762 P2d 997 (1988)). As *Vannatta* and *Lewis* demonstrate, we are not free, as plaintiff suggests, to ignore the examples that the legislature set forth in ORS 12.117(2)(d) when interpreting the term "sexual exploitation." Instead, we examine the ordinary meaning of the general term "sexual exploitation" as well as the specific examples that the legislature has given to help in understanding the meaning of that more general term.[13]

Plaintiff argues that reliance on the principle of *ejusdem generis* is incorrect here because that principle applies only when "a nonspecific or general phrase * * * appears *at the end* of a list of items in a statute." *See Vannatta*, 324 Or at 533 (so describing *ejusdem generis*) (emphasis added). Because the general phrase in ORS 12.117—"[s]exual exploitation * * *, including but not limited to"—appears *before* the list of examples, plaintiff contends, the examples do not limit the general phrase. We disagree. In interpreting a general term, we have considered the context provided by specific examples when those examples fall after the general term, as well as when they are placed before that

---

[13] Plaintiff's position that the term "sexual exploitation" should be interpreted independently of the specific examples given in ORS 12.117 would be correct if the legislature had placed the term in a separate sentence or had, through another grammatical device, demonstrated that the different grounds for extending the statute of limitations were unrelated.

term as they were in *Vannatta* and *Lewis*. *See Liberty v. State Dept. of Transportation*, 342 Or 11, 20, 148 P3d 909 (2006) (applying *ejusdem generis* when interpreting the phrase "outdoor activities such as hunting, fishing, [and other specified activities]").

■   Plaintiff next argues that this court need not apply the principle of *ejusdem generis* because the legislature chose to connect the general term "sexual exploitation" with the specific examples by using the phrase "including but not limited to." Plaintiff cites *United States v. Migi*, 329 F3d 1085, 1088 (9th Cir 2003), where the Ninth Circuit refused to apply *ejusdem generis* when the plain meaning of the statutory text was "apparent." The court also noted that use of the phrase "including but not limited to" helps to mitigate "the sometimes unfortunate results of rigid application of the *ejusdem generis* rule." *Id.* at 1089 (internal quotation marks omitted). Regardless of whether we are constrained by the "rule" of *ejusdem generis*, we will apply the principle when, as here, it provides useful guidance in interpreting a statutory term. In doing so, we give interpretive weight to all the words that the legislature used—including both the term "sexual exploitation" and the specific examples of sexual exploitation. That does not mean, of course, that the specific examples constitute the universe of items to which the general term refers; rather, it means only that our interpretation of the general term includes consideration of those specific examples.[14]

---

[14] Many other courts interpret statutes that use the phrase "including but not limited to" and then provide specific examples in the same way; that is, they interpret the general term in light of (although not limited to) the specific examples. *See State v. Kavajecz*, 139 Idaho 482, 486-87, 80 P3d 1083, 1087-88 (2003) (interpreting phrase "any lewd or lascivious act or acts * * * including but not limited to, genital-genital contact, oral-genital contact, anal-genital contact, oral-anal contact, manual-anal contact, or manual-genital contact" to not include kissing a child's chest); *Board Chosen Freeholders v. State*, 159 NJ 565, 570, 576-77, 732 A2d 1053, 1056, 1059 (1999) (interpreting phrase judicial costs, "including but not limited to the following costs: salaries, health benefits and pension payments of all judicial employees, juror fees and library material costs" to not include the capital costs of judicial facilities); *Peralta Community College Dist. v. FEHC*, 52 Cal3d 40, 48-50, 801 P2d 357, 362 (1990) (interpreting phrase "to take such action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, and restoration to membership in any respondent labor organization" to not include unlimited compensatory damages). *But see United States v. Migi*, 329 F3d 1085, 1089 (9th Cir 2003) (*ejusdem generis* does not apply when Congress

■ Having established that the principle of *ejusdem generis* may help us understand the legislature's intent in this case, we turn to the proper application of that principle. The Court of Appeals correctly noted that, when applying the principle, the court "examine[s] the 'basic characteristics' of the enumerated items." *Schmidt*, 218 Or App at 683 (quoting *Lewis*, 339 Or at 350). However, in examining the "basic characteristics" of the activities, we do not look at each activity *individually*, glean a basic characteristic from that activity, and then determine whether the conduct at issue in this case shares that basic characteristic. If we simply looked at each example individually and determined that no sexual exploitation occurred because plaintiff's conduct did not fall within the listed examples, we would be disregarding other words of the statute. The legislature provided that "sexual exploitation" includes, *but is not limited to,* the conduct enumerated in the statute. As a result, we cannot interpret the term as encompassing *only* the conduct in the listed examples.

■ Instead, when using the principle of *ejusdem generis,* the court seeks to find, if it can, a *common* characteristic among the listed examples. We then determine whether the conduct at issue, even though not one of the listed examples, contains that characteristic and, thus, falls within the intended meaning of the general term. *See Liberty*, 342 Or at 20-21 (describing and applying principle); *see also Vannatta*, 324 Or at 533 (finding common characteristic). That can be done here. The three examples of sexual exploitation offered by the legislature are: (1) contributing to the sexual delinquency of a minor, which occurs when an adult engages in sexual intercourse or deviate sexual intercourse with someone under the age of 18 or causes someone under the age of 18 to have deviate sexual intercourse; (2) "conduct which allows, employs, authorizes, permits, induces or encourages a child to engage in the performing for people to observe or the photographing, filming, tape recording or other exhibition which, in whole or in part, depicts sexual conduct or contact," or, in simpler terms, allowing or encouraging child pornography;

connects the general term and the specific examples with the phrase "including but not limited to").

and (3) "[a]llowing, permitting, encouraging or hiring a child to engage in prostitution, as defined in ORS chapter 167."[15]

Here, we seek to identify, if we can, a common characteristic of the examples that helps us in determining, at a minimum, what conduct the legislature intended to include within the general term "sexual exploitation." Obviously, "sexual exploitation" necessarily requires some conduct of a sexual nature, and, as discussed above, the dictionary definition of exploitation is "an unjust or improper use of another person for one's own profit or advantage." As a result, identifying the relevant common trait in the listed examples as the fact that each activity is sexual in nature or the fact that each involves an adult improperly using a child for his own purposes would not help us to better understand the meaning of the term "sexual exploitation" as used in ORS 12.117(2)(d).

Defendant offers a more limiting alternative common characteristic: each example given in ORS 12.117(2)(d), defendant argues, "addresses a child either touching himself or someone else." Defendant is incorrect, however, because not all the enumerated examples necessarily involve a child touching him or herself or someone else. The second example requires only that the perpetrator "encourage[ ]" a child to engage in a performance that "depicts sexual conduct *or* contact" for others to observe or record. ORS 12.117(2)(d)(A) (emphasis added). "Sexual contact" clearly requires some sort of physical contact with the child. But the term "sexual conduct" does not necessarily require that the child touch him or herself or someone else. It could, for example, involve a child's partial or complete nudity, without any touching of the child or another. *See* ORS 163.665(3)(f) (for purposes of child pornography statutes, "sexually explicit conduct"

---

[15] ORS 167.007(1) provides:

"A person commits the crime of prostitution if:

"(a) The person engages in or offers or agrees to engage in sexual conduct or sexual contact in return for a fee; or

"(b) The person pays or offers or agrees to pay a fee to engage in sexual conduct or sexual contact."

For purposes of ORS 167.007, "sexual conduct" means "sexual intercourse or deviate sexual intercourse," and "sexual contact" means "any touching of the sexual organs or other intimate parts of a person not married to the actor for the purpose of arousing or gratifying the sexual desire of either party." ORS 167.002.

includes "[l]ewd exhibition of sexual or other intimate parts"). Although, to be useful, the common trait must be narrow enough to provide some context for the proper interpretation of "sexual exploitation," we cannot adopt a trait unless it is common to all the listed examples.

■ Although defendant's proposed "common characteristic" is incorrect, we find the examples that the legislature provided helpful in another way: in each situation, an adult causes—or attempts to cause—a child to be personally involved in a sexual act. We therefore conclude that conduct qualifies as "sexual exploitation of a child" under ORS 12.117(2)(d) if an individual uses a child in a sexual way for his or her own gratification or benefit, and the child is personally involved.

■ Here, plaintiff presented evidence that Charvet called plaintiff into his office and, with the door shut, began asking plaintiff questions about sexuality and describing masturbation using "street or gutter talk." Charvet then began masturbating. While Charvet was masturbating, plaintiff was physically present and could see—and did see—what Charvet was doing. Further, plaintiff felt that he could not leave the situation and that he was forced to watch Charvet masturbate. Considering Charvet's role as a priest and spiritual advisor—and his role as plaintiff's advisor within the seminary—plaintiff's belief was not unreasonable.

From that evidence, a jury reasonably could find that Charvet was using plaintiff's presence and plaintiff's reactions to Charvet's questioning for his own sexual stimulation. Charvet intentionally exposed plaintiff to Charvet's own sexual conduct, with full awareness that plaintiff could observe what Charvet was doing, and plaintiff did, in fact, observe and understand what Charvet was doing. Indeed, a trier of fact could infer that Charvet needed to have plaintiff present for Charvet to masturbate, or at least that Charvet required plaintiff's presence to facilitate the act. In that way, Charvet personally involved plaintiff in Charvet's masturbation, a sexual act.

For the foregoing reasons, we conclude that there was sufficient evidence for a reasonable factfinder to find that Charvet's conduct constituted "cruelty to [a] child" under

ORS 12.117(2)(a)(B). We also conclude that there was sufficient evidence for a reasonable factfinder to find that that conduct constituted "sexual exploitation of a child" under ORS 12.117(2)(d). Accordingly, the trial court erred in concluding that plaintiff's action was time-barred and granting defendant's motion for summary judgment on that ground.

Because a majority of the Court of Appeals concluded that plaintiff's claim was time-barred, it did not reach defendant's alternative argument that Charvet's alleged conduct was insufficient to support *respondeat superior* liability.[16] We therefore remand the case to that court so that it may consider that issue.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

**WALTERS, J.,** concurring.

I concur in the majority's decision. I write separately to note a small, but I think important, point about the application of the principle of *ejusdem generis*. Under the principle of *ejusdem generis*, a general statutory phrase is not given its plain and ordinary meaning; its meaning is limited or narrowed by the specific examples that the legislature provides in conjunction with that general term. *Lewis v. CIGNA Ins. Co.,* 339 Or 342, 351, 121 P3d 1128 (2005). In this case, the majority decides that it is not always constrained by the principle of *ejusdem generis* when the legislature precedes the specific examples with the phrase "including but not limited to." 347 Or at 404.

I agree with the majority that the principle of *ejusdem generis* may not apply in that circumstance, but I want to explain why. The assumption underlying the principle of *ejusdem generis* is that the legislature intentionally has used specific examples to limit or narrow the meaning of a general term. In my experience, however, that is not always the case. The legislature may instead use examples to illustrate the applicability of a term, without intending to limit or

---

[16] As noted, the court did reach the issue of *respondeat superior* liability for Father Frank's conduct. We express no opinion as to that issue.

narrow its common meaning, or to broaden the common meaning of a term. It is understandable to think that the phrase "including but not limited to," followed by a list of examples, conveys an intent to illustrate or to broaden, rather than to limit the meaning of a general term. After all, the phrase says that the general term is *not limited* to the examples. But as this case demonstrates, that phrase can mean that the examples given are not the only application of a general term, and in that sense, that the examples are not limiting, without also meaning that the examples do not perform a different narrowing function. In other words, a general statutory term may be limited *by*, even though it is not limited *to*, specific statutory examples. I write to point out that the phrase "including but not limited to" is itself imprecise, and to urge that the legislature both decide the purpose for which it uses examples and convey that purpose as clearly as it can.

Let me illustrate the various purposes to which examples may be put. Suppose that the legislature were to enact a statute prohibiting the "cutting of all trees, *including but not limited to* oak, maple, and birch." One common meaning of the word "tree," as stated in the dictionary, is "a woody perennial plant, having a single main stem that may be short but is usu[ally] considerably elongated, has generally few or no branches on its lower part, and is crowned with a head of branches and foliage or (as in palms) of foliage only." *Webster's Third New Int'l Dictionary* 2435 (unabridged ed 2002). By giving three examples of plants the legislature considers to fall within the definition of the word "tree," the legislature could be seeking to narrow the dictionary definition of the general term "tree," or it could be using the examples to illustrate the application of that definition, or even to broaden that definition.

If the legislature intended to use the examples to limit the dictionary definition of "tree" to plants that share common characteristics with oak, maple, and birch, we would apply the principle of *ejusdem generis* when faced with a question of whether the statute prohibits the cutting of a certain plant that might not be considered a tree. We would look, as we do in this case, for a common characteristic that those three examples share beyond the fact that all are tall, woody,

and crowned with foliage. We would then determine if the plant at issue also shared that characteristic.

If, alternatively, the legislature intended to protect all plants that fall within the dictionary definition of the word "tree," but used the examples to ensure that certain trees, the only ones actually growing in the area subject to statutory protection, would not be cut, we might take a different approach. We might understand the examples as illustrative and not examine whether the plant at issue had characteristics in common with oak, maple, or birch, other than those required by the dictionary definition of the word "tree."

Still another possibility is that the legislature used the examples to expand, rather than to contract, the dictionary definition of "tree." A "maple" is "a tree *or shrub* of the genus *Acer.*" *Id.* at 1379 (first emphasis added; second emphasis in original). By specifically including "maple" in its list of protected plants, the legislature could have intended to broaden the dictionary definition of "tree" to prohibit the cutting of all maples, including small Japanese maples, which might not otherwise be considered "trees."

Examples serve no right or wrong purpose, and the legislature may use examples in one statute to establish limits on an ambiguous term, and in another to illustrate or expand. Precisely because there are so many ways in which the legislature may use examples, I write to urge that the legislature consider the distinctions that I have drawn, use care in selecting examples, and express as clearly as possible the office that it expects its examples to serve. With that assistance, courts will be better able to carry out the legislature's intent.